Jon E. COHEN

v.

Charles DUNCAN et al.

No. 2004–335–M.P.

Supreme Court of Rhode Island.

May 22, 2009.

John A. Tarantino, Esq., Providence, for plaintiff.

Lauren E. Jones, Esq., Providence, for defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The Chanler at Cliff Walk sits on an imposing site on Memorial Boulevard in Newport, offering spectacular views of the city's Easton's Beach (commonly known as First Beach). Although there has been a hotel at this site since 1945, the building now is in a residential zone, and the scope

of a series of upgrades and renovations to the facility has resulted in a dispute with a neighbor that has found its way to this Court. We must decide whether the improvements to the hotel, consisting of reconstructed decks, added stairs and courtyards, and relocated parking violated § 17.72.030 of the Newport Zoning Ordinance (ordinance) concerning alterations to nonconforming uses. In a decision on an administrative appeal, the Newport Zoning Board of Review determined that the hotel did not violate the ordinance because the exterior renovations did not expand or change the hotel's use as a transient guest facility and the relocation of the parking lot was not a change of use. On further appeal, however, the Superior Court for Newport County disagreed, and the trial justice reversed the zoning board's decision. We granted Cliff Walk's petition for a writ of certiorari on April 26, 2007. After a thorough review of the record, it is our opinion that the Superior Court made findings that clearly were wrong and misapplied the law. We hold that the hotel's improvements did not violate the provisions of the Newport Zoning Ordinance. We therefore quash the judgment of the Superior Court.

### Facts and Travel

The Inn at Cliff Walk, Inc. operates a hotel named The Chanler on Memorial Boulevard in Newport.[1] Jon E. Cohen resides at 12 Cliff Terrace in Newport, in close proximity to the hotel.

The history of zoning for the hotel begins in 1945, when the Newport Zoning Board of Review (board) granted approval to operate a hotel in an area designated as a residential district under the zoning ordinance then in effect. It is important to note that although the hotel was a conditionally permitted use at the time of initial approval, the zoning ordinance underwent several revisions in later years. In 1955, the zoning ordinance was amended to require a special exception for a hotel to operate in the district. In 1977, the City of Newport again revised the ordinance, and this time it zoned the property within an R–20 district. In such districts, the city no longer permitted hotels by special exception. In 1994, pursuant to the Zoning Enabling Act of 1991, G.L.1956 §§ 45–24–27 through 45–24–72, the City of Newport adopted a new zoning ordinance. This most current iteration of the ordinance classifies the hotel as a "transient guest facility," and it remains a prohibited use in an R–20 district. *See* § 17.28.020 (listing uses permitted by right and by special-use permit); § 17.04.050B ("any use not included in this zoning code as a permitted use is prohibited"); § 17.08.010 (defining "transient guest facility" as primarily for day-to-day or week-to-week occupancy in which guests depend on facilities outside of guest unit for meals). As a result, the trial justice held that the hotel was a nonconforming use within the meaning of the Zoning Enabling Act, § 45–24–31(49),[2] and the ordinance, § 17.08.010.[3] It

---

1. The Chanler is located on Tax Assessor's Plat 31, Lot 1. Nicholas, Inc. owns the real estate on which the building sits. Although it is not clear in the record, John Shufelt appears to possess the controlling interest in Nicholas, Inc. For the purposes of this appeal, we do not distinguish between the entities and will refer to them either as Cliff Walk or The Chanler.

2. General Laws 1956 § 45–24–31(49) provides in relevant part:

 "*Nonconformance.* A building, structure, or parcel of land, or use thereof, lawfully existing at the time of the adoption or amendment of a zoning ordinance and not in conformity with the provisions of that ordinance or amendment. Nonconformance is of only two (2) types:

is undisputed that a hotel has been in continuous operation at the property despite these several revisions to the zoning ordinances. For the purposes of this review, the parties have agreed that the current ordinance classifies the hotel as a nonconforming use.

In early 2000, John Shufelt, through his company, the Inn at Cliff Walk, Inc. (Cliff Walk), purchased the property now housing The Chanler, intending to continue to use it as a hotel. Originally, Shufelt intended to merely fix up the hotel, but over time he developed more extensive plans for renovations. The following summary will trace the various phases of the project as gleaned from the record on review.

### Historic District Commission

In July 2000, Cliff Walk submitted architectural drawings to the Historic District Commission to obtain approval for exterior renovations to the hotel. Depicting the north and east elevations, those plans proposed a new slate roof, a new flat roof supported by columns with balustrade railings forming a second-floor balcony, a door to replace a window that would create an entrance to the balcony, and privacy lattice. The easterly rendering depicted three sets of stairs leading onto the decks below the colonnade roof. The northerly depiction also showed three sets of stairs leading to the deck below the colonnade roof. Neither of the plans showed walled courtyards or private balconies. On August 28, 2000, the zoning officer, Guy E. Weston, wrote to inform Cliff Walk that the Historic District Commission had approved the following proposed construc-

tion: "[w]indow to door on east elevation," "[d]ormer on west elevation," "[f]lat roof extension and colonnade on north, east and south elevation," "[b]alcony on east and north elevation of flat roof addition." In his letter, the zoning officer also instructed Cliff Walk to obtain any necessary building permits for the work approved.

### Rhode Island Coastal Resources Management Council

Cliff Walk also applied to the Coastal Resources Management Council (CRMC), in August 2000, seeking permission to extend the hotel's existing balconies six feet closer to the coastline and to construct two new porches on the north side of the structure. As part of the CRMC process, Cliff Walk obtained certification on August 21, 2000 from William P. Pascoe, the Newport Building Official, that he had reviewed the plans, dated August 2000, for a project called "Cliff Walk—Alterations and Additions."[4] Pascoe confirmed that the plans complied with the zoning ordinance, but he also noted that Cliff Walk required a building permit to do the work indicated in the plans. The CRMC gave its approval on August 23, 2000.

### Building Department

On August 31, 2000, Cliff Walk applied for a building permit from the City of Newport. The city issued a permit on September 1, 2000 and described the permitted work as follows: "relocate non-bearing partitions, remove ceilings, replace windows on 1st, 2nd & 3rd floors. Install exterior doors, per plan." With its application, Cliff Walk had submitted a first-

---

"(i) Nonconforming by use: a lawfully established use of land, building, or structure which is not a permitted use in that zoning district."

**3.** Newport Zoning Ordinance § 17.08.010 provides that a nonconforming use is "[a]

lawfully established use of land, building, or structure which is not a permitted use in that zoning district."

**4.** From the record, it is unclear what plans Cliff Walk provided to the CRMC.

floor plan showing interior renovations, including new fireplaces, doors, windows, and walls. Cliff Walk also submitted a first-floor plan of the east wing. This plan portrayed private doorways into the guest rooms from the outside. The deck below the colonnade roof depicted privacy screens between the rooms, creating individual balconies leading to stairs. These drawings were shaded, appeared to be less detailed and less complete, and did not depict any walled courtyards.

Cliff Walk began work shortly after its permits were issued. On October 17, 2000, during construction, Cliff Walk submitted two more detailed plans to the building official.[5] The east wing plan showed the decks creating four private balconies with four sets of private stairs. The east wing plan also depicted walls enclosing the outdoor areas creating outdoor courtyards, as well as a lightly defined outer perimeter wall. In March 2001, Cliff Walk submitted still more plans to the building official.[6] On September 11, 2001, the building official wrote to Cliff Walk's architect, Richard R. Long, and informed him that he had made a number of inspections of the project and that he found Cliff Walk to be in substantial accord with the approved plans and revised submittals.

## Zoning Certificate and Development Plan Review

On October 26, 2000, Cliff Walk's attorney sent a letter to Guy Weston, the zoning officer for the City of Newport, requesting a zoning certificate for the parking area.[7] The attorney's correspondence explained that in 1999, the zoning board had decided that a commercial (or fee-for-parking) parking lot in the southwest corner of the property was not prohibited by the zoning code. Cliff Walk's attorney informed the zoning officer that the owner now proposed to remove an existing paved fifty-space parking lot from the front of the hotel and replace it with gardens and lawns. Cliff Walk also planned to pave the southwest corner of the parcel and dedicate other grass areas formerly used for both overflow and commercial parking solely to overflow parking, creating a total of fifty available spaces.

With his letter, Cliff Walk's counsel provided a copy of the board's 1999 decision and findings of fact. In that decision, the board unanimously had found that since 1945, the lawn area and parking area not used by hotel guests had been rented out to area and beach visitors for parking vehicles, and it therefore approved the hotel's

---

5. Although the plans never were marked "approved," it is not disputed that the plans were filed with the building official.

6. These plans were not marked "approved," but they are marked as received by the building department.

7. On October 26, 2000, Cliff Walk also sent two other letters requesting zoning certificates for the installation of a refrigeration unit and use of the common areas to include a permanent patio, outdoor food-staging area, bathroom facilities, and a potential swimming pool. In the zoning officer's reply to these two letters, he declared that the refrigeration unit was an impermissible alteration to the nonconforming development, but he did not appear to specifically respond to the other proposals. Cliff Walk initiated an appeal of the zoning officer's rejection of the refrigeration unit, which it later abandoned. Cliff Walk also appealed other aspects of the zoning certificates, and the board determined that the ordinance did not permit the construction of a permanent patio, bathroom structure, or staging area. These matters, however, were the subject of appeal in *Inn at Cliff Walk, Inc. v. Zoning Board of Review of the City of Newport*, C.A. No. 2001–380, 2004 WL 1351155; the Superior Court's decision in that case was not appealed to this Court, and it is not before us for the purposes of our review.

use of the area for commercial parking. The board attached a plan to its decision, which depicted the entire southwestern corner of the lot as an area generally used for parking.

In response to Cliff Walk's letter, Weston requested a site plan showing the lawn and parking areas. On November 22, 2000, Cliff Walk's attorney responded to Weston, enclosing a site plan depicting the landscaping and a parking layout for fifty spaces.[8] On December 8, 2000, the zoning officer issued a zoning certificate to Cliff Walk, declaring that, "[t]he proposed layout of the off-street parking spaces, as shown on the plan entitled 'Proposed Lawn & Parking Plan, The Chanler at Cliff Walk', dated 11/15/00 is permitted under the present zoning code of the City of Newport. However Chapter 17.88.020(G) of the code requires the proposed off-street parking changes be reviewed as a Development Plan."

On May 22, 2001, Cliff Walk submitted plans for development plan review of the proposed parking lot. The plans were slightly different from the designs submitted for the zoning certificate, in that a few of the parking spaces were moved, the driveway was redesigned, and the entrance to the property from Memorial Boulevard was narrowed. The plans were stamped "site plan review" and checked "approval" on May 25, 2001. Weston, acting as both zoning officer and development plan review agent, wrote to Cliff Walk on May 25, 2001; he specified that he approved the development plan for the parking area reconfiguration subject to conditions regarding sewer connections and signage size.

He also required Cliff Walk to implement the landscaping plan as approved, and he forbade Cliff Walk from using the driveway running to Cliff Avenue as a major entrance to or exit from the property. On July 27, 2001, CRMC approved the design of the parking lot, water quality management measures, and landscaping plan.

### Cohen's Appeal to the Board

On June 4, 2001, Cohen appealed the issuance of the approval of the development plan and the building permits, as well as Cliff Walk's failure to obtain permits for all changes to the property. Cohen contended that Cliff Walk's various proposals constituted an expansion of a nonconforming use in violation of § 17.72.030B and C. Cohen objected to Cliff Walk's proposals to install paved parking in the southwest part of the property, to use the driveway between Cliff Avenue and the property, to narrow the Memorial Boulevard entrance, and to construct terraces and additions to the easterly side of the building. On June 7, 2001, the zoning officer wrote to Cliff Walk, giving it notice of the appeal. Also, because of the appeal, the zoning officer stayed all proceedings and required all work to stop.

### The Board Hearing

On October 22, 2001 and January 31, 2002, the board held hearings on Cohen's appeal. While the appeal was pending before the board, Cliff Walk continued construction with respect to the exterior and the courtyards, and it began tearing up the old parking lot.[9]

---

8. The plan also depicted the east wing balconies, stairs, walled courtyards, and outer wall. The portrayals of the east wing essentially were the same as the October 17, 2000 plan, except that the outer perimeter wall was more defined.

9. Cliff Walk continued its construction despite the fact that it was required to cease construction. There is no evidence in the record that the city enforced its stop-work order. Although enforcement issues are not before us on review, we must express our concern that

## Shufelt's Testimony

When he testified before the board, Shufelt said that in July 2000, Cliff Walk developed plans to renovate the interior and exterior of the hotel. He testified that he wanted to improve the hotel by transforming it from a mid-scale facility to a luxury hotel. He aimed to make the hotel more tranquil and restore its look so that it would resemble a private mansion. To achieve this goal, he developed plans to decrease the number of rooms from twenty-two to twenty, move the parking lot away from the front of the building, replace that parking area with lawns and gardens, and reconfigure the entrance on Memorial Boulevard. He testified that the east wing of the hotel was designed to look like a "cheap motel." He said the design was flawed because the existing wooden deck required guests to walk by the other guestroom windows to access their rooms. Therefore, he planned to build private entrances by creating walled courtyards and individual stairways to private decks. Shufelt testified that he showed Cohen some plans in January 2001. He also met with all the abutters to review his plans. He testified that at a meeting with about fifty or sixty neighbors in August 2001, he observed all but two of them applaud his plans.

To achieve all the improvements he envisioned, Shufelt developed a budget of $6 million. The $6–million budget included labor and materials, mechanical systems, bathrooms with marble showers, fireplaces and wet bars, furnishings, a kitchen, windows and doors, a roof, grounds, operations, professional services, and other expenses.[10] Eventually, after numerous revisions, his plans were submitted to the building department. Shufelt acknowledged in his testimony before the board that the work Cliff Walk completed was "much more extensive than what it says on that permit." With respect to work on the inside of the hotel, the building was gutted and refrained, and he replaced almost all the electrical, plumbing, HVAC, and the sprinkler system.[11]

With respect to exterior work, Shufelt demolished the old decking, reconfigured the decks, removed asphalt from the old parking lot, and cut down about ten trees, replacing them with about eighty new trees. Shufelt testified that the old decking was in "great disrepair." While replacing it, he decided to reconfigure the design. He removed some decks and made others bigger. However, Shufelt testified that the new decks were about the same size as the old decks. He said that the courtyard walls were merely garden walls constructed to create privacy and that they varied in height from six to ten feet.

Regarding the parking lot, Shufelt testified that the hotel continuously had used the southwest corner of the parcel for facility-related parking. This area, which he said was partly paved, also had been used for parking on a fee basis by beachgoers.

## Zoning Officer's Testimony

The zoning officer, Guy E. Weston, also testified at the hearing. Weston testified that he told Cliff Walk that it did not require zoning relief before making the architectural changes that had

---

the City of Newport failed to enforce the stop-work order it issued against Cliff Walk.

**10.** At the hearing, Cohen's counsel stated that he had no objection to any interior changes proposed for the project.

**11.** Separate permits were obtained for the electrical, gas, plumbing, and HVAC.

been approved by the Historic District Commission. He reviewed the various plans submitted to the building official and he confirmed that the construction conformed to the plans. He testified that although the building permit did not specify that work would be done involving decks, stairs, or courtyards, the key words on the permit were, "per plan," and that those improvements were depicted on the plans. He explained that with that notation on the permit, the building department clerk could retrieve the plans and show them to anyone inquiring about the permit. Significantly, he explained that neither the courtyards nor the garden walls required building permits and that neither the stairs nor the courtyard walls violated the setback requirements. Weston testified that he did not believe Cliff Walk's exterior improvements amounted to a substantial change to or expansion of the nonconforming use. He testified that on December 8, 2000, he issued the zoning certificate that approved the proposed parking-lot changes because in 1999, the board had decided that the entire lawn area in the southwest portion of the lot historically had been used for off-street parking.

### Cohen's Testimony

Cohen also testified at the hearing. He testified that he met with Shufelt to go over the status of the project five or six times, and that the plans always seemed to be changing. He recalled that he went to the building department office to read the permits, but whatever he saw referred only to interior work. He admitted that he did not look at the plans Cliff Walk filed with the building official because he understood from the building permit that it only allowed interior renovations and the replacement of windows and doors. With respect to the parking lot, Cohen testified

that the parking area in the southwest corner was paved, but that it was not a "formal" parking lot and that it mainly was used as an overflow parking area for fee-paying beach patrons. As for the exterior renovations, he said that the porches appeared to be partially complete at the time of the hearing. Cohen estimated that the east wing decks, porches, and courtyards measured 1,500 square feet. He also estimated that the south side decks measured 790 square feet, and the north side decks measured 2,000 square feet. Cohen testified that according to his calculations and measurements, the work performed on the hotel structure amounted to more than a 43 percent increase in the building's original footprint. Cohen admitted, however, that he never measured the original decking. Furthermore, he admitted that his measurements included the courtyards and walls, which the building official testified did not implicate the zoning setback requirements.

### The Board's Decision

On October 29, 2002, the board issued a written decision. The board concluded that Cohen's appeal was timely, but it denied his appeal on the merits. The board also found that Cliff Walk's renovations decreased the number of rooms from twenty-two to twenty, decreased the size of the bar, reduced the pavement in front of the hotel, and replaced pavement with lawn and gardens. As for the southwest parking lot, the board found that the parking location approved by the development plan review was the same area where the board, in 1999, approved commercial parking based on that area's historical use as a parking area. The board therefore concluded that renovating the parking area in the southwest corner of the property for solely hotel-related use did not amount to a change of use. As for the exterior improvements, the board found that Cliff

Walk submitted plans to reconfigure the decks on the north and east sides of the building and to create open-air courtyards providing private access for its guests. The board ruled that the planned renovations to the structure did not expand or change the use of the property from its designation as a transient guest facility. The board concluded that the impact of the use of the property actually would be less intense on the neighborhood and that Cliff Walk "relied in good faith" on the approval of the changes by the building and zoning officials.

## Appeal to the Superior Court

On November 13, 2002, Cohen appealed the board's decision to approve the building permits and site plans to the Superior Court under § 45–24–69. On appeal, Cohen argued that the board improperly found that Cliff Walk relied in good faith on the actions of municipal officials, and that the private balconies, stairs, and courtyards, as well as the parking relocation, violated Newport Zoning Ordinance § 17.72.030B. and C.[12]

◼ On June 9, 2004, in a comprehensive bench decision, the trial justice reversed the board. She found that Cohen had filed a timely appeal and then held that the board made errors of law and also clearly erred in view of the reliable, probative, and substantial evidence before it when it confirmed the building official's approval of the balconies, stairs, and walled courtyards and when it confirmed the zoning officer's approval of the parking relocation. In her decision, the trial justice found that Cohen was an aggrieved party who was entitled to appeal under § 45–24–64 with respect to the building official's approval of Cliff Walk's plans to construct the decks, stairs, and courtyards and also with respect to the zoning officer's approval of the plans that had been submitted for development plan review.[13]

12. The ordinance, § 17.72.030, in effect at the time of appeal provided as follows:

"A. Nothing in this zoning code shall be deemed to prevent the strengthening or restoring to a safe condition of any structure or part thereof declared to be unsafe by decree of any official charged with protecting the public safety, provided that such work does not increase the nonconformity thereof. Nothing in this zoning code shall be deemed to prohibit ordinary repair and maintenance of a nonconforming structure or replacement of existing materials, provided that such work does not increase the nonconformity thereof.

"B. No nonconforming use of land shall be moved to another part of a lot or outside the lot, and no nonconforming use of a building shall be moved or extended to any other part of the building not expressly arranged and designed for such use at the time the use became nonconforming, and no building containing a nonconforming use shall be moved, unless the result of such move is to end the nonconformity. No nonconforming building shall be moved, unless the result of such moving is to reduce or eliminate its nonconformity.

"C. No nonconforming use of land, nonconforming use of a structure, or nonconforming structure shall be changed except to a conforming use or structure. No nonconforming structure, if once changed to conform, shall thereafter be changed so as to be nonconforming again.

"D. A use established by variance or special use permit shall not acquire the rights of this section."

13. At oral argument a question was raised whether approval of development plan review is an appealable decision under the Zoning Enabling Act §§ 45–24–63 and 45–24–64 in light of the fact that § 45–24–49 provides that development plan review is in some circumstances "advisory" to the permitting authority, while in other circumstances, "rejection of the application" may be an appealable decision under § 45–24–64. Section 45–24–64 provides in relevant part:

"An appeal to the zoning board of review from a decision of any other zoning enforcement agency or officer may be taken by an aggrieved party. The appeal shall be taken within a reasonable time of the date

The trial justice also found that the board erred in its interpretation of the ordinance as permitting alterations to the hotel as a nonconforming development because the ordinance did not expressly permit alterations by right or by special permit, as required by the Zoning Enabling Act, § 45–24–40.[14] Therefore, she concluded, Cliff Walk's proposed alterations could have been undertaken only after the issuance of a variance.

In addition, the trial justice found that the "overriding public policy" of zoning law is to accomplish the eventual elimination of nonconforming uses, and she held that the balconies, stairs, courtyards, walls, and parking area amounted to "substantial alteration in the nonconformity and would be far beyond that allowed by the ordinance." The trial justice also found that the board erred in upholding the building official's decision to allow the exterior alterations without the development plan review required for transient guest facilities under § 17.88.020. Further, the trial justice decided that the board committed a fundamental error when it viewed the improvements on a piecemeal basis rather than as a whole, and that it improperly afforded Cliff Walk an estoppel defense.

## Certiorari

Cliff Walk filed a petition for a writ certiorari with this Court, which we granted on April 26, 2007. Cliff Walk asserts that the trial justice misconstrued Newport's zoning ordinance when she failed to uphold the board's decision approving Cliff Walk's renovations. Specifically, Cliff Walk alleges the trial justice erred when she determined that a nonconforming use cannot be altered without a use variance. Cliff Walk asserts that the trial justice's interpretation of the ordinance fails to give effect and meaning to the words of the ordinance, and therefore she wrongly concluded that the renovations were approved unlawfully. Cliff Walk also argues that the trial justice gave too much weight to the general zoning policy to eventually eliminate nonconforming uses, and that the alterations proposed by Cliff Walk, to wit, the balconies, stairs, courtyards, walls, and parking area, were not prohibited by the restrictions set forth in the ordinance. Cliff Walk further argues that the trial justice misconstrued the ordinance when she determined that Cliff Walk was required to obtain development plan review for the exterior alterations and that the trial justice misapplied the law in upholding the board's determination that Cohen

of the recording of the decision by the zoning enforcement officer or agency by filing with the officer or agency from whom the appeal is taken and with the zoning board of review a notice of appeal specifying the ground of the appeal."

Because this issue was neither briefed nor argued, we need not and so do not now reach the issue of whether Newport's approval of development plan review is appealable by an objector. *See Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002).

**14.** Section 45–24–40 provides:

"(a) A zoning ordinance may permit a nonconforming development to be altered under either of the following conditions:

"(1) The ordinance may establish a special-use permit, authorizing the alteration, which must be approved by the zoning board of review following the procedure established in this chapter and in the zoning ordinance; or

"(2) The ordinance may allow the addition and enlargement, expansion, intensification, or change in use, of nonconforming development either by permit or by right and may distinguish between the foregoing actions by zoning districts.

"(b) The ordinance may require that the alteration more closely adheres to the intent and purpose of the zoning ordinance.

"(c) A use established by variance or special use permit shall not acquire the rights of this section."

filed a timely appeal from the building permit and zoning certificate. Cliff Walk further maintains that the trial justice exceeded her authority by ruling on the theory of estoppel. Finally, the petitioner urges that this Court should hold that Cohen's appeal is barred by laches.

In response, Cohen argues that: (1) the trial justice properly interpreted the Zoning Enabling Act and the Newport Zoning Ordinance because (a) physical expansions and alterations of property constituting a nonconforming use are impermissible, (b) public policy aims to restrict and eliminate nonconforming uses, and (c) alterations to the hotel are not permissible under § 45–24–40(c), even under Cliff Walk's interpretation of the ordinances; (2) the trial justice was correct when she determined that Cliff Walk required development plan review at the outset; (3) the trial justice properly upheld the board's finding that Cohen's appeal was timely; and (4) the trial justice's decisions regarding estoppel were correct, and laches is not available to Cliff Walk.

### Standard of Review

■ When an aggrieved party appeals a decision of a zoning board of review to the Superior Court, the Superior Court "shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact." Section 45–24–69(d). "This is due, in part, to the principle that 'a zoning board of review is presumed to have knowledge concerning those matters which are related to an effective administration of the zoning ordinance.'" *Pawtucket Transfer Operations, LLC v. City of Pawtucket,* 944 A.2d 855, 859 (R.I.2008) (quoting *Monforte v. Zoning Board of Review of East Providence,* 93 R.I. 447, 449, 176 A.2d 726, 728 (1962)). On appeal, the Superior Court may only:

"reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:

"(1) In violation of constitutional, statutory, or ordinance provisions;

"(2) In excess of the authority granted to the zoning board of review by statute or ordinance;

"(3) Made upon unlawful procedure;

"(4) Affected by other error of law;

"(5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or

"(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 45–24–69(d).

■ On certiorari, this Court confines its review to a determination of whether the trial justice acted within the authority granted to her under the statute. *Sciacca v. Caruso,* 769 A.2d 578, 582 (R.I.2001); *see also Almeida v. Zoning Board of Review of Tiverton,* 606 A.2d 1318, 1320 (R.I. 1992). "In reviewing the trial justice's decision, we do not weigh the evidence but rather determine whether there existed competent evidence to support the decision." *Almeida,* 606 A.2d at 1320. This Court will not reverse a Superior Court justice's decision unless it is shown that the justice "misapplied the law, misconceived or overlooked material evidence, or made findings that were clearly wrong." *OK Properties v. Zoning Board of Review of Warwick,* 601 A.2d 953, 955 (R.I.1992) (quoting *R.J.E.P. Associates v. Hellewell,* 560 A.2d 353, 354 (R.I.1989)). Furthermore, this Court reviews issues of statutory construction *de novo*; therefore, a zoning board's determination of law is not binding on this Court, and we may review such determinations as to "what the law is and its applicability to the facts." *Pawtucket Transfer Operations, LLC,* 944 A.2d

at 859 (quoting *Gott v. Norberg,* 417 A.2d 1352, 1361 (R.I.1980) and *Narragansett Wire Co. v. Norberg,* 118 R.I. 596, 607, 376 A.2d 1, 6 (1977)).

## Analysis

After a thorough review of the record, applying the above standards to the matter before us, we are of the opinion that the Superior Court justice, although detailed and scholarly in her approach, exceeded her authority under § 45–24–69(d). In our opinion, the trial justice misconstrued the ordinance and made findings that clearly were wrong and that were not supported by the record when she found that Cliff Walk's improvements violated § 17.72.030 because they amounted to "substantial alterations" to the nonconforming use. On the basis of our review of the entire record, we hold that the board's findings of fact were not clearly erroneous or affected by any error of law. There was ample evidence for the board to have concluded that Cliff Walk's improvements relating to the decking, stairs, parking area, and courtyards did not expand or change the use, or otherwise violate § 17.72.030.

When she construed the ordinance, the trial justice held that the Zoning Enabling Act of 1991, § 45–24–40, permits cities and towns to provide for alterations to nonconforming uses by permit or by right, but because § 17.72.030 of the Newport Zoning Ordinance did not affirmatively grant the right to alter nonconforming uses, no such right existed in that city. The trial justice then found that Cliff Walk's improvements amounted to a "substantial alteration" and were therefore not permitted by the ordinance. As a result, she held that Cliff Walk failed to obtain a necessary variance from the requirements of the ordinance. We agree with Cliff Walk that

the trial justice, in her analysis, failed to apply the ordinance properly.

 We give weight and deference to a zoning board's interpretation and application of the zoning ordinance, provided its construction is not clearly erroneous or unauthorized. *See Pawtucket Transfer Operations, LLC,* 944 A.2d at 859–60. When we determine the law and its applicability to the facts, we equally apply the rules of statutory interpretation to the construction of a zoning ordinance. *Mongony v. Bevilacqua,* 432 A.2d 661, 663 (R.I.1981). Therefore, we give clear and unambiguous language in an ordinance its plain and ordinary meaning. *Pawtucket Transfer Operations, LLC,* 944 A.2d at 859. "[W]hen the language of a statute or a zoning ordinance is clear and certain, there is nothing left for interpretation and the ordinance must be interpreted literally." *Mongony,* 432 A.2d at 663.

 The ordinance at issue, in no uncertain terms, prohibits five types of alterations to nonconforming developments. *See* § 17.72.030 (entitled "Alteration to nonconforming development"). In summary, subsections B. and C. of § 17.72.030 of the ordinance prohibit: (1) moving a nonconforming use of land to another part of the lot or outside the lot; (2) moving or extending the nonconforming use of a building to another part of the building "not expressly arranged and designed for such use at the time the use became nonconforming;" (3) moving a building containing a nonconforming use unless the move ends the nonconformity; (4) moving a nonconforming building unless the move results in a reduction or elimination of the nonconformity; and (5) changing a nonconforming use of land, use of a structure, or nonconforming structure, except to change it to a conforming use or structure.

We must give effect to the words in the ordinance when those words expressly pro-

hibit certain alterations to nonconforming developments. We are mindful that the authority of a zoning board and the validity of zoning ordinances are circumscribed by the Zoning Enabling Act. The enabling act authorizes cities and towns to adopt ordinances that allow the alteration of nonconforming developments by special-use permit, by permit, or by right. *See* § 45-24-40. Newport has adopted an ordinance entitled "Alteration to nonconforming development," yet has refrained from accepting the General Assembly's invitation to allow the specific aforementioned alterations as provided in the ordinance. *See* § 17.72.030. However, to adopt the trial court's interpretation that therefore all "alterations" must be denied, no matter how slight, because "alterations" are not expressly allowed, would serve to transform the entire ordinance into meaningless surplusage. *See Ruggiero v. City of Providence,* 893 A.2d 235, 238 (R.I.2006) ("we must presume that the drafters intended every word of the ordinance to have a useful purpose and to have some force and effect").

Although the ordinance does not affirmatively grant permission to "alter" nonconforming uses by right, it clearly does not affirmatively deny the right to make any alteration to a nonconforming use. Rather, it specifically forbids extensions, changes, and movements of nonconforming uses or buildings. We have read similar prohibitory language to limit what the owner of a nonconforming use may do by right. *See Costantino v. Zoning Board of Review of Cranston,* 74 R.I. 316, 324-25, 60 A.2d 478, 482 (1948) (concluding ordinance providing that a "non-conforming use shall not be extended" limits what may be done as of right); *accord Hugas Corp. v. Veader,* 456 A.2d 765, 770 (R.I. 1983). In our opinion, subsections B. and C. of § 17.72.030 of the Newport Zoning Ordinance limit the alterations to a nonconforming use that a landowner may undertake as of right, with respect to the movement, change, and extension of the nonconforming use or building. Therefore, we believe the ordinance by its plain meaning allows some alterations, as long as they do not change the use, extend the use, or move the use or the building in the manner proscribed by the ordinance. *See* § 17.72.030.

## Whether Cliff Walk's Improvements Violated the Ordinance

Our next task is to determine whether the trial justice correctly concluded that Cliff Walk's improvements violated subsections B. and C. of § 17.72.030 of the ordinance. We first note that the ordinance differentiates between nonconforming uses and nonconforming structures. The only provisions applicable to the controversy before us are those provisions pertaining to nonconforming uses. This is so because the use, but not the structure, became nonconforming when Newport amended its zoning ordinances to prohibit the use of hotels in R-20 districts. There is no allegation or evidence in the record that the building itself became nonconforming as a result of any amendment to the zoning ordinance. Therefore, we will focus our inquiry on whether Cliff Walk's proposed improvements (1) moved the building or moved or extended the hotel use to another part of the land or to another part of the building not previously designed for such use at the time the use became nonconforming; or (2) changed the use of the land or structure from that of a hotel use. *See* § 17.72.030B., C. Our analysis is limited to the decking, stairs, garden walls, courtyards, and parking layout, and we do not address any of the other interior or exterior designs because they are not matters pressed on appeal.[15]

**15.** *See* footnotes 7 and 10, *supra.* Although we focus our opinion on the issues as present-

### The Decks, Stairs, and Courtyards

██ The board found that the implementation of the hotel's plans would decrease the number of rooms in the hotel and made the nonconforming use less intense. The board then concluded that the proposed renovations, including the decks, stairs, and courtyards, did not otherwise expand the nonconforming use or amount to a change of use. The trial justice found that the board erred because Cliff Walk enlarged the hotel and extended the building containing the nonconforming use in violation of the ordinance. We disagree.

██ There is no hard and fast rule to determine when an improvement amounts to an extension of a nonconforming use or a change in use. *See Santoro v. Zoning Board of Review of Warren*, 93 R.I. 68, 72, 171 A.2d 75, 77 (1961). "Each case must be considered and determined on its own facts." *Id.* "An extension, expansion, or enlargement usually involves a significant physical change in the structure in which the nonconforming use is being carried on." 4 Edward H. Ziegler, *Rathkopf's The Law of Zoning and Planning*, § 73:16, at 73–75 (Thomson/West 2007). Also, a physical expansion into land not previously used for the nonconformity generally constitutes an extension of a nonconforming use. *See id.* at 73–74. An extension typically involves construction of a new building, an addition to a building, an extension in the area devoted to the use, or a significant physical change in the structure that accommodates the nonconforming use. *See id.*

First, there is utterly no evidence in the record that would justify a conclusion that Cliff Walk moved the building or that the decks, stairs, or courtyards moved or extended the hotel use to another part of the land or building not previously designed for such use at the time the use became nonconforming. *See* § 17.72.030B. Although Cohen testified before the board that the footprint of the building had increased, he also admitted that his calculations did not take into consideration the square footage of the original decking that was attached to the building. Shufelt testified that Cliff Walk tore down the old and decrepit decking and replaced it. Although he reconfigured the design to some extent, decreasing the dimensions of the decks in some places and enlarging them in other places, he testified that the new decks were about the same size overall as the old decks. Furthermore, when he made his calculations, Cohen included the walled courtyards, but the zoning officer testified that the walls and courtyards did not violate any zoning ordinances and did not require building permits. Therefore, it is apparent that there is no evidence in the record that the improvements extended the use of the hotel or moved the building by increasing the hotel's footprint.

Furthermore, the garden and courtyard walls did not amount to significant physical changes in the structure, nor did they expand the area for hotel use, nor are the walls considered part of the "building." The ordinance defines a building as "any structure used or intended for supporting or sheltering any use or occupancy." Section 17.08.010. The record reveals that the courtyard walls do not support or shelter any use or occupancy. The walls Cliff Walk proposed are garden walls; they are not structural walls. The record reveals that the courtyards are not enclosed by a roof; rather, they are open-aired and primarily function to create privacy.

ed and preserved by the particular parties on appeal, we express our concern about the piecemeal attempt at obtaining zoning approval of certain other aspects of the project that are not now before us on appeal.

Cliff Walk's construction of stairways to the guest rooms also did not involve significant physical changes to the structure or operate to extend the area that accommodated the hotel use. The zoning officer testified that the stairs did not violate the zoning ordinances, and the record also reveals that the stairs did not violate the setback requirements. There is no evidence in the record that the addition of the individual sets of stairs extended the use of the facility as a hotel. *Compare Crawford v. Building Inspector of Barnstable,* 356 Mass. 174, 248 N.E.2d 488, 490 (1969) (holding enclosure of small ten-foot-by-two-foot landing-porch area to repair rotting wood did not enlarge the nonconforming use), *with Grundlehner v. Dangler,* 29 N.J. 256, 148 A.2d 806, 808, 810–11 (1959) (holding addition of 260–square foot area to create an office, elevator, stairway, and smoking room was an enlargement of a nonconforming use that could not be viewed as insubstantial).

■ Second, it is also clear from the record that the board was justified in its conclusion that the decking, stairs, and courtyards did not change the use of the land or the use of the structure from that of a hotel. *See* § 17.72.030C. Our case law has established that "[a] change of use occurs when the proposed use is 'substantially different from the nonconforming use to which the premises were previously put * * *.'" *Harmel Corp. v. Members of the Zoning Board of Review of Tiverton,* 603 A.2d 303, 305 (R.I.1992) (quoting *Jones v. Rommell,* 521 A.2d 543, 545 (R.I.1987)). "Minor repairs, changes or alterations that do not substantially change the nature of the use or expand the area of the use are unlikely to be held unlawful." 4 Ziegler, § 73:16 at 73–75. "Ordinarily a mere increase in the amount of business done in pursuance of a nonconforming use, or a change in the equipment used, does not constitute a change of the use itself." *Santoro,* 93 R.I. at 71, 171 A.2d at 77 (quoting *Salerni v. Scheuy,* 140 Conn. 566, 102 A.2d 528, 530 (1954)).

The use of the structure is not substantially different; it is still a hotel, it has not increased the number of rooms, it has not changed the types of services it provides, the structure was not replaced, there is no evidence of increased business or patronage, and there is no evidence that it has changed its effect on the neighborhood. *See Souza v. Zoning Board of Review of Warren,* 104 R.I. 697, 699, 248 A.2d 325, 327 (1968) (holding change from prior nonconforming use of woodworking, plumbing, and heating shop to an auto body shop was substantially different); *Santoro,* 93 R.I. at 72, 171 A.2d at 77 (upholding board's finding that replacing wooden grocery store and gas station with a new building and adding additional gasoline pumps, "all of which would mean additional business and increased traffic and noise, would together constitute a change of the nonconforming use"); *see also Cape Resort Hotels, Inc. v. Alcoholic Licensing Board of Falmouth,* 385 Mass. 205, 431 N.E.2d 213, 219–20 (1982) (holding conversion of a nonconforming resort hotel into a large entertainment complex with pub, show lounge, and disco was a change in use).

The board's findings that the courtyards, decks, and stairs did not "expand or change the use of the property as a transient guest facility" were not clearly erroneous or affected by any error of law. We conclude, therefore, that the trial justice erred when she found that these improvements violated § 17.72.030 B. and C.

### The Parking Area

■ The board found that the proposed revised parking area, for which development plan review was obtained, was in the southwest corner of the parcel, the

same general area where the board, in 1999, had decided that the hotel had accommodated parking since 1945. Therefore, the board concluded that locating parking in the southwest area of the property would not be a change of use. The trial justice found that the board erred because Cliff Walk's parking lot renovations violated § 17.72.030. We disagree.

Shufelt testified that he wished to decrease the total number of spaces from 150 to 50, eliminate parking in the front of the building, and restrict parking to the southwest corner of the land. In his testimony before the board on Cohen's appeal, the zoning officer said that he believed that locating the parking in the southwest corner was proper based on what had been presented to him and based on the board's 1999 decision that found that the "entire lawn area had been used for off-street parking." The board's 1999 decision concluded that that entire section of the parcel had been used for parking since 1945. Furthermore, even Cohen testified that the southwest area was paved and had been used for parking vehicles. Shufelt also testified that under the hotel's previous management, room guests and dining guests used the area for parking, and the facility also rented spaces to members of the public for beach parking during the summer months. Shufelt likewise testified that part of the area previously was paved.

Based on the above testimony and previous facts found by the board in 1999, it is clear that the board's findings of fact were not clearly erroneous or affected by any error of law. There was ample evidence before the board for it to have concluded that Cliff Walk did not move, extend, or change the use of the parking area. Indeed, the fact that Cliff Walk decreased the available parking spaces and the number of hotel rooms supports the conclusion that Cliff Walk did not extend the use.

Moreover, the fact that the southwest corner had been used historically for hotel and function parking since 1945 and was at least partially paved substantially buttresses the illation that the parking was not moved or extended to an area not previously designated for such use at the time it became nonconforming. *See* § 17.72.030B.

Furthermore, the board did not err when it decided that Cliff Walk's relocation of the parking lot did not amount to a change of use under § 17.72.030C. In other words, it cannot be said that the previous use of the southwest corner of the parcel was "substantially different" from the proposed use. *See Harmel Corp.,* 603 A.2d at 305–06. The record reveals that that area contained both lawn areas and partially paved areas where the hotel permitted guests and visitors to park their vehicles. Although the area was described as "overflow" and "commercial" parking, it nevertheless was used for parking, and it retained the same purpose and character as a parking area, and thus has remained a protected use. *See Building Inspector of Seekonk v. Amaral,* 9 Mass.App.Ct. 869, 401 N.E.2d 158, 159 (1980) (holding volume of cars in junkyard was not limited to volume existing when use became nonconforming, the increase being only a change in degree of use, but not in nature, purpose, or effect on the neighborhood).

Furthermore, although Cliff Walk eliminated the fee-based parking spaces used by beachgoers, this did not amount to a change in use. In *Harmel,* this Court considered whether a change of use occurred when the defendant renovated a building that was formerly a private club and restaurant/banquet facility. *Harmel Corp.,* 603 A.2d at 307. This Court held that the new business that eliminated the private club but continued to operate a restaurant/banquet facility was not "sub-

stantially different" from the former use; therefore, there was no change of use. *Id.* As in *Harmel,* Cliff Walk eliminated some aspect of its former operation, but it continued the principal use, transitioning from a private parking area with an additional public use during the summer to a solely private parking area. Because the private use was preexisting, Cliff Walk's elimination of the three-month beach parking is not a substantial difference that could rightly be characterized as a change of use.

■ With respect to the layout of the parking area, including such details as the lighting, paving, and planting aspects, there has been no showing that these amenities violated the ordinance.[16] "The fact that improved and more efficient or different instrumentalities are used in the operation of the use" does not change the use when the nature and purpose of the use remains the same and the instrumentalities merely make the use available to the owners. *New London v. Leskiewicz,* 110 N.H. 462, 272 A.2d 856, 860 (1970) (remanding case for consideration whether renting camping spaces to trailers enlarged or changed the use of picnic and camping park); *see also People v. Emigrant Industrial Savings Bank,* 261 A.D. 402, 404–05, 25 N.Y.S.2d 605 (1941) (removal of building formerly storing automobiles and subsequent clearing of land for parking automobiles is not a change in use). Adding new paving, providing for

runoff, and installing lights and walkways are all related to Newport's safety and maintenance concerns as set forth in the ordinances pertaining to development plan review procedure. *See* § 17.88.010 ("the intent [of development plan review] is to minimize traffic hazards and congestion; to provide a more healthful and esthetically pleasing environment; to guarantee the adequate provision of water, sewerage, police, fire and other public services, and to promote the overall public health, safety, and general welfare"); § 17.88.040 ("Improvements of the following type may be required by the city in the course of development plan review * * * A. Right-of-way improvements to include pavement widening, curb, gutter, sidewalks and street lights" and "F. Plantings * * * [to] protect public safety."). It seems clear to us that the city, through the zoning officer/review agent, required and approved the lights, pavement, and other details of the parking scheme as part of the development plan review procedure in order to maintain the parking area in a safe condition consistent with current standards imposed by the city. These improvements did not change the nature or purpose of the use, but rather made the parking area available to Cliff Walk to conform to current city standards; therefore, we do not believe these improvements changed the use or otherwise violated subsections B. and C. of § 17.72.030 of the ordinance.[17]

---

**16.** Development plan review also included approvals of certain improvements made to the Memorial Boulevard entrance and the driveway connecting to Cliff Avenue. Shufelt testified that he was considering allowing employees to park on the driveway; however, it does not appear from the record that any city official ever approved the driveway for parking. Therefore, use of the driveway for parking was not a matter before the board on appeal. *See* § 45–24–64 (providing jurisdiction for appeal from an official's decision).

**17.** We take this opportunity to observe that chapter 24 of title 45 specifically provides as follows: "The zoning ordinance shall permit the continuation of nonconforming development; however, this does not prohibit the regulation of nuisances." Section 45–24–39(b). As the Supreme Court of Connecticut has noted: "[Z]oning regulations are not the only restraints upon the use of property. Other ordinances may exist that prohibit unreasonable noise or impose restrictions on the location or size of structures. In addition, the

## General Laws 1956 § 45–24–40(c)

Cohen argues that the trial justice was correct when she asserted that even if Cliff Walk's renovations did not violate the provisions of the ordinance, they still were impermissible alterations to a nonconforming use under § 45–24–40(c).[18] Section 45–24–40(c) provides that "[a] use established by variance or special use permit shall not acquire the rights of this section." The trial justice reasoned that The Chanler was created as a conditional use, a classification that she concluded is a predecessor of the special-use permit. Therefore, she held that The Chanler could not acquire the rights enabled by § 45–24–40, which authorize ordinance provisions that allow alterations to nonconforming developments. However, Cliff Walk argues that the language of this subsection, instead, provides that a landowner who obtains a use that is created by a variance or special-use permit may not, at the same time, also claim the rights of a nonconforming use. Cliff Walk further deduces that once the city amended the ordinance by deleting the provision authorizing the conditional use, the prior use became a lawful nonconforming use and, essentially, it cannot now be considered a "use established by a * * * special use permit." Section 45–24–40(c).

After reviewing the language of the statute, we believe that it is unnecessary to embrace either interpretation because the city did not impermissibly permit Cliff Walk to alter the use or undertake an "addition and enlargement, expansion, intensification, or change in use" by permit or by right. Section 45–24–40(a)(2). This is so because the plain language of the statute compels the conclusion that the "rights" referred to in this section are the rights to alter a nonconforming use by way of an "addition and enlargement, expansion, intensification, or change in use" by permit or by right. *Id.*

The board, in its decision, found that Cliff Walk reconfigured its decks, created open-air courtyards that provided private access to the guest room, and redesigned the layout of the hotel's parking accommodations. The board further found that the proposed layout of the parking area was not a change of use because the area had historically been used for parking. The board also found that the decks and courtyards did not expand or change the use of the property as a transient guest facility. Furthermore, the board found that by decreasing the accommodations from twenty-two rooms to twenty rooms, decreasing the size of the bar, and decreasing the amount of pavement, the nonconforming use of the property would be rendered less intense.

As we have explained above, there is nothing in the record that would support a conclusion that these renovations added to the use, extended the use, expanded the use, or changed the use. Furthermore, the evidence does not support a conclusion that the use has been altered. It is undisputed that The Chanler remains a transient guest facility and that it did not increase its hotel or parking accommodations or expand its services. We also see no foundation in the record from which it

common law prohibits a use of land that constitutes a nuisance." *Zachs v. Zoning Board of Appeals of Avon,* 218 Conn. 324, 589 A.2d 351, 356 (1991). Should the hotel's parking lot prove to be a nuisance to neighboring property owners, it is entirely possible that the common law would provide an avenue for seeking abatement.

18. The trial justice asserted, in a footnote, that when considering § 45–24–40(c), "even if Newport had accepted the State's invitation to allow alteration of nonconforming development, it could not have extended such permission to Cliff Walk inasmuch as the hotel was originally established pursuant to what is now a special use permit."

can be concluded that the board erred when it found that the challenged renovations would render the use less intense. Intensification of a use typically involves a substantial increase in the volume or intensity of the use. *See* 4 Ziegler, § 73:15 at 73–60. The record simply does not reflect that Cliff Walk increased the volume or intensity of its hotel accommodations or other guest facilities. Furthermore, there is nothing in the record that would suggest that the proposed parking layout would increase the amount or frequency of visitors to the hotel. Because the record does not reveal that the city granted Cliff Walk the right to alter its use or to undertake an "addition" or "enlargement, expansion, intensification, or change in use," we conclude that § 45–24–40(c) of the Zoning Enabling Act did not prevent Newport from approving the challenged renovations.

## Conclusion

For the reasons set forth in this opinion, we quash the judgment of the Superior Court and remand this case to the Superior Court with our decision endorsed thereon.