DECISION
In these consolidated cases, W. Bart Lloyd ("Mr. Lloyd") appeals from a September 1, 2006 decision of the Zoning Board of Review of the City of Newport ("Zoning Board" or "Board"), denying his application for a special use permit, and Mr. Lloyd and Elizabeth Lloyd (collectively "Lloyds") appeal from a November 28, 2007 decision of the Zoning Board, granting a special use permit to Mark and Donna Bardorf (collectively *Page 2 
"Bardorfs"), abutting landowners. As these cases implicate the same statutory and ordinance provisions, this Court, in furtherance of judicial economy and to promote clarity, consolidated these cases for review and disposition.[1] Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 I Facts and Travel A The Lloyd Application
The Lloyds are the owners of a piece of property located at 16 Chestnut Street, Newport, Rhode Island, identified as Lot 57.4, Tax Assessor's Plat 12. The Lloyds' property lies in Newport's historic R-10 residential district, "an area of medium density residential development . . . extend[ing] outward from the highest density development located within the urban core." The Codified Ordinances of the City of Newport, Rhode Island ("Newport Code") § 17.20.010. Single-family dwellings are permitted by right in the R-10 district. Newport Code § 17.20.020(A). Currently situated on the property is the three-story, dimensionally non-conforming[2] structure that serves as the primary residence of the Lloyds and their three children during the summer months.[3]
On October 3, 2005, Mr. Lloyd filed an application with the Zoning Board for a special use permit pursuant to §§ 17.72.030(C)[4] and 17.108.020(G) of the Newport Code, seeking to *Page 3 
construct a second-and third-story addition above the existing rear "footprint" of the structure.[5] Mr. Lloyd applied for a special use permit because the proposed addition to his home would "enlarge[] or subject to addition or intensification" the existing dimensional non-conformities with respect to building height and east side line setback.[6] Newport Code § 17.72.030(C). Prior to the public hearing before the Zoning Board, Mr. Lloyd's proposed addition was approved by the City of Newport's Historic District Commission and the Planning Board.
Before the public hearing on Mr. Lloyd's application on May 22, 2006, John and Donna Flynn (collectively "Flynns"), owners of 14 Chestnut Street, moved to dismiss the application on the grounds that Mr. Lloyd failed to seek and obtain a dimensional variance in addition to a special use permit. (Flynns' Mem. in Supp. of Mot. to Dismiss at 3.) In their dismissal motion, the Flynns argued that in order for a property owner to alter a dimensionally non-conforming structure with respect to one of its non-conforming elements, he or she would have to obtain a dimensional variance in conjunction with a special use permit if said alterations would be "in violation of dimensional requirements. . . ."Id. at 4. Mr. Lloyd countered, asserting that the Flynns' dismissal motion should be denied because his application merely contemplated an enlargement of the structure's pre-existing dimensional non-conformities by way of special use permit. (Lloyd Mem. in Opp'n to Mot. to Dismiss at 4.) Although the Board did not dismiss Mr. *Page 4 
Lloyd's application outright, it required him to amend his application to include a request for both dimensional relief and a special use permit.
At the outset of the May 22, 2006 hearing, Mr. Lloyd testified that he was seeking zoning relief from the Board in order to enlarge an existing addition on the rear of his home. (Tr. 5/22/06 at 6.) As Mr. Lloyd explained, he was seeking to "architecturally harmonize the house," to add an additional two bathrooms to the structure, and to make the home "harmonious . . . with the rest of the neighborhood." (Tr. 5/22//06 at 8, 13.) When questioned by Board Chairperson Peter O'Connell ("Mr. O'Connell") as to whether it would be possible to re-configure the interior of the home in order to accommodate the two additional bathrooms, Mr. Lloyd responded that "there is no real way to do it within the existing space." (Tr. 5/22/06 at 8-9.)
Mr. O'Connell then asked Mr. Lloyd whether his proposed addition had received approval from the Newport Historic District Commission. (Tr. 5/22/06 at 9.) Mr. Lloyd responded that he had received approval from the Commission in 1991 for the construction of the proposed addition as well as a small vestibule, but that only the vestibule had been constructed. Id. Mr. Lloyd added that the proposal had been considered by the Planning Board in 2005, and that the Planning Board approved the proposal as in accordance with the Comprehensive Plan for the City of Newport. (Tr. 5/22/06 at 9-10.)
When asked by Mr. O'Connell whether there would be a change in the existing "footprint" of the structure, Mr. Lloyd testified that the proposed addition would "go[] up over the existing walls. . . ." (Tr. 5/22/06 at 10.) Mr. Lloyd testified that the proposed addition would not encroach further into the setbacks, but that it would exceed the building height requirement set forth in § 17.20.060 of the Newport Code. (Tr. 5/22/06 at 11.) *Page 5 
The Board then focused its attention on whether the proposed addition would interfere with the amount of light and air reaching the Flynns' property. Mr. Lloyd testified that his structure and the Flynns' structure are not parallel to one another; as such, all construction on his structure would be to the north of the Flynns' structure and would not obstruct the amount of light reaching the Flynns' windows. (Tr. 5/22/06 at 11-12.) Mr. Lloyd also indicated that the proposed addition would not interfere with the Flynns' existing views of Narragansett Bay. (Tr. 5/22/06 at 12-13.)
On cross-examination by counsel for the Flynns, Mr. Lloyd was asked to describe the "hardship" produced by his home's existing one-and-one-half bathrooms. (Tr. 5/22/06 at 14.) Mr. Lloyd explained that the existing bathroom arrangement was insufficient to meet the needs of his immediate and extended family and visiting friends. (Tr. 5/22/06 at 15.) Counsel for the Flynns then asked Mr. Lloyd whether it would be possible to construct an additional bathroom in the basement of his home in lieu of the proposed addition; Mr. Lloyd responded that the basement would not be a desirable location for a bathroom because it is currently unfinished, has a dirt floor, and no windows. (Tr. 5/22/06 at 23.) When pressed by counsel as to whether it would be possible to re-configure and consolidate the three existing bedrooms on the third floor of his home in order to construct an additional bathroom, Mr. Lloyd testified that this option would not meet the needs of his family for bedroom space. (Tr. 5/22/06 at 24.)
At the conclusion of Mr. Lloyd's remarks, the Zoning Board heard testimony from George Durgin ("Mr. Durgin"), Mr. Lloyd's real estate expert. Mr. Durgin testified that, prior to his appearance before the Board, he had reviewed Mr. Lloyd's application, inspected his property and the surrounding area, and reviewed the relevant sections of the Newport Code and the Comprehensive Plan. (Tr. 5/22/06 at 47.) Mr. Durgin testified that Mr. Lloyd was seeking to *Page 6 
enlarge the existing use of the property as a single-family dwelling and was not expanding the home's "footprint." Id.
When asked whether the proposed addition would satisfy the requirements for the granting of a special use permit set forth in § 17.108.020(G) of the Newport Code, Mr. Durgin indicated that the proposed addition would "better conform to the surrounding area," would not "change the traffic pattern in the area," would "be in harmony with the surrounding areas," and would not adversely affect nearby dwellings, churches, and public buildings. (Tr. 5/22/06 at 48-49.) Mr. Durgin also disagreed with the position advanced by counsel for the Flynns that the Flynns' air and light would be affected by the proposed addition to Mr. Lloyd's home. (Tr. 5/22/06 at 49.) With respect to the remaining factors to be considered by the Board in granting a special use permit, Mr. Durgin maintained that the proposed addition would not create an additional fire hazard and was consistent with Newport's Comprehensive Plan. (Tr. 5/22/06 at 51-52.) However, counsel for the Flynns elicited on cross-examination that Mr. Durgin was not familiar with the other structures on Chestnut Street and was not qualified as a fire expert. (Tr. 5/22/06 at 56.)
Once counsel for the Flynns had completed his cross-examination of Mr. Durgin, Mr. O'Connell made the following statement on the record:
 This is an implication that [Mr. Durgin] made . . . that because we are building over existing footprint, existing structure, we are not increasing footprint. [Mr. Durgin's] implication was that . . . increased mass would have no effect. . . . [I]f [Mr. Durgin's] argument would be also if you had a one-story garage and went up twenty more feet, you are not increasing the lot coverage and, therefore, no impact? I don't necessarily agree with that because I do think there is possibly an adverse impact to [the Flynns'] piece of property. (Tr. 5/22/06 at 57.) *Page 7 
Mr. O'Connell then asked Mr. Durgin whether he still believed that an increase in the "mass" of the proposed addition to Mr. Lloyd's structure would not, without a corresponding increase in the structure's footprint, increase lot coverage. (Tr. 5/22/06 at 58.) Mr. Durgin answered in the affirmative. Id.
Following the remarks of Mr. Durgin, John Flynn ("Mr. Flynn") testified in opposition to Mr. Lloyd's application. Mr. Flynn stated that the proposed addition to Mr. Lloyd's home would be approximately seven feet from the existing structure at 14 Chestnut Street, a carriage house with a second-floor apartment. (Tr. 5/22/06 at 60-61.) According to Mr. Flynn, the existing structure on Mr. Lloyd's property obstructs the amount of sunlight reaching the windows of the apartment for "a good portion of the day as the sun moves east to west." (Tr. 5/22/06 at 66.) Mr. Flynn was emphatic that the proposed addition was "so massive and so big [in relation to] the need [for additional bathrooms]" that it would adversely affect the amount of light and air reaching his property. (Tr. 5/22/06 at 68.) Mr. Flynn stated later that "[t]here is no question in my mind that this structure is . . . going to overwhelm my property. It's going to cut down on my air and absolutely . . . cut down my light and sunshine." (Tr. 5/22/06 at 79.)
At the conclusion of counsels' closing arguments, the members of the Zoning Board discussed their individual views of the application. Mr. O'Connell stated that "putting a bathroom in the cellar [of Mr. Lloyd's home] is . . . ridiculous[,]" and that "not having a bathroom for the third floor bedrooms is more than a mere inconvenience[.]"[7] (Tr. 5/22/06 at 98-99.) With respect to the Board's "public convenience and welfare" determination on the special use permit, Mr. O'Connell asserted that the proposed addition to Mr. Lloyd's structure would not be "in harmony with the surrounding area," as it would "adversely impact[] th[e] piece *Page 8 
of property next-door" by obstructing the amount of light reaching the property. (Tr. 5/22/06 at 100-101.)
Board Member Elizabeth Minifie ("Ms. Minifie") agreed with Mr. O'Connell "that there really is more than a mere inconvenience. . . ." (Tr. 5/22/06 at 102.) With respect to the "massing" of the proposed addition, Ms. Minifie felt that "the 400 square feet is not that enormous . . . a space that is impeding the space and air and light of Mr. Flynn's home next-door." (Tr. 5/22/06 at 103.) Board Member Rebecca McSweeney concurred with Mr. O'Connell and Ms. Minifie that the lack of a bathroom on the third floor amounted to "more than a mere inconvenience." Id. Board Member Marvin Abney ("Mr. Abney") disagreed with his colleagues on the Zoning Board, stating that Mr. Lloyd failed to show that the lack of bathrooms amounted to "more than a mere inconvenience." (Tr. 5/22/06 at 106.) Mr. Abney was satisfied that "there may have been other options or other ways of getting to the same thing in a different way." Id. Further, Mr. Abney stated that Mr. Lloyd did not request the "least relief necessary," based on the effect on the Flynns' light. Id. Finally, Board Member Michael Martin stated that there were no discernible effects on the amount of air and light reaching the Flynn property. (Tr. 5/22/06 at 107.)
The Board then voted three to two to approve Mr. Lloyd's application. However, as the concurring vote of four of the five Members of the Zoning Board sitting at a hearing is required to decide in favor of an applicant on a special use permit, see Newport Code § 17.112.040(B)(3), the Board rendered a decision denying Mr. Lloyd's application on September 1, 2006. In rendering its decision, the Board articulated the following findings of fact:
 4. The application fails to satisfy the requirements for a special use permit in that it is not in accordance with the public convenience and welfare when considering the following criteria: (a) The nature of the proposed site, including its size and shape and *Page 9 
the proposed size, shape and arrangement of the structure (17.108.020(G)(1)); (b) The nature of the surrounding area and the extent to which the proposed use or feature will be in harmony with the surrounding area (17.108.020(G)(3)); and (c) The proximity of dwellings, churches, schools, public buildings and other places of public gatherings (17.108.020(G)(4)). Specifically, the Board finds that since the proposed alteration would be located seven feet away from the Flynns' property, the massing and proximity of the proposed alteration will have an adverse impact on the property next-door, including in terms of lighting, shadows, and air flow.
 5. The application fails to meet the standards for a dimensional variance in that: (a) The applicant has failed to present evidence that the relief requested is the minimum variance that will make possible the reasonable use of the land, building or structure as required by § 17.108.010(5)(a). In particular, the applicant has failed to show the Board that he cannot provide the additional bathrooms that he desires at the Property in a manner that requires less of a variance than is requested; (b) The variance is injurious to the neighborhood, specifically, to the Flynns' property at 16 Chestnut Street . . .; and (c) The Board finds that the denial of the relief does not cause more than a mere inconvenience.
Mr. Lloyd, aggrieved by the Board's decision, took a timely appeal to this Court, seeking to reverse the Board's decision.
 B The Bardorf Application
The Bardorfs are the owners of real property located at 18 Chestnut Street, Newport, Rhode Island, also known as Lot 249, Tax Assessor's Plat 12. Like the Lloyds' property, the Bardorfs' property is located in Newport's R-10 residential zone. Currently situated on the property is the two-story, dimensionally non-conforming structure that serves as the single-family dwelling of the Bardorfs and their three children.[8]
The Bardorfs propose to remove a deck and an existing two-story addition on the rear of their home and construct a 22-foot by 34-foot, two-story addition. The Bardorfs also propose to *Page 10 
construct a 4-foot by 11-foot deck or veranda from the second floor bedroom of the addition. On May 31, 2007, the Bardorfs filed an application for a special use permit pursuant to §§ 17.72.030(C) and 17.108.020(G) of the Newport Code. Prior to the public hearings on the Bardorfs' application on October 11 and October 22, 2007, their application was reviewed and subsequently approved by the City of Newport's Planning Board and the Newport Historical Commission.
At the outset of the October 11th hearing, Mr. Lloyd moved to dismiss the application on the grounds that it was "incomplete and inaccurate." (Tr. 10/11/07 at 4.) According to Mr. Lloyd, he was not arguing that he did not have notice of the Board's hearing on the Bardorf application; rather, he was arguing that the notice was "fundamentally flawed" because it did not describe with specificity the zoning relief sought by the Bardorfs.[9] (Tr. 10/11/07 at 7, 9.) As Mr. Lloyd explained, the Bardorfs were not entitled to alter their dimensionally non-conforming structure "as a matter of right" because the application proposed "an increase in the [square footage] [of] [the] building envelope on the first floor of twenty-seven percent . . . and on the second floor of fifty-three percent"; as such, the proposed addition would intensify existing dimensional non-conformities. (Tr. 10/11/07 at 7.) According to Mr. Lloyd, an increase in a structure's "building envelope" is the equivalent of an increase in the structure's "lot building coverage." Id. Accordingly, Mr. Lloyd asserted that when the "lot building coverage" of the first floor of the Bardorfs' proposed addition was added to the "lot building coverage" of the *Page 11 
second floor, the total "lot building coverage" would increase, in contravention of § 17.72.030(C) of the Newport Code.
Board Member Martin Cohen ("Mr. Cohen") disagreed with Mr. Lloyd's definition of "lot building coverage" as including multiple floors of a single structure, stating, "Lot coverage is lot coverage — doesn't matter which floor." (Tr. 10/11/07 at 8.) However, Mr. Lloyd continued to press his argument that removal of the Bardorfs' existing rear addition and deck and replacement with "two stories of house" would increase the portion of the lot covered by building, despite the fact that the "footprint" of the proposed addition would cover a smaller portion of the lot and result in an overall decrease in lot building coverage from thirty-six percent to thirty-four percent. Id.
As his next objection to the Bardorf application, Mr. Lloyd argued that the Bardorfs — in addition to applying for a special use permit for their proposed second-floor deck — were also required to obtain dimensional relief. (Tr. 10/11/07 at 12.) Mr. Lloyd maintained that the previous owners of 18 Chestnut Street had requested a "limited" dimensional variance in order to construct the one-story deck that the Bardorfs sought to remove; as such, he argued that the Bardorfs should be required to obtain a new variance in order to construct in the space previously occupied by the deck. (Tr. 10/11/07 at 13.)
At the conclusion of Mr. Lloyd's presentation, counsel for the Bardorfs contended that Mr. Lloyd waived his notice argument when he appeared before the Board and presented his objections to the Bardorf application. (Tr. 10/11/07 at 17.) Then, counsel focused the Board's attention on the relevant provisions of the Newport Code and their application to the Bardorfs' application. *Page 12 
Counsel stated that the Bardorfs' home is non-conforming by dimension, as "[t]he [lot] coverage is too high [,] . . . [t]he front of the building is within the front setback [,] . . . and the lot size is too small." (Tr. 10/11/07 at 19.) However, counsel stressed that the single-family dwelling otherwise conforms to the use regulations of the R-10 residential district, and that the proposed addition is within the height, setback, and other dimensional requirements of the district.Id. Counsel for the Bardorfs also indicated that the proposed addition would not increase or intensify the structure's existing dimensional non-conformities with respect to the front line setback and lot size, and would decrease the non-conformity with respect to lot coverage. (Tr. 10/11/07 at 19-20.) Accordingly, counsel for the Bardorfs asserted that, with the exception of the 4-foot by 11-foot deck attached to the second floor of the proposed addition, the Bardorfs should be allowed "as a matter of right" to construct the addition. See Newport Code § 17.72.030(C). With respect to the second floor deck, however, counsel for the Bardorfs acknowledged that a special use permit would be required because the Bardorfs were seeking to alter their home with respect to a non-conforming element, namely, the setback requirements. (Tr. 10/11/07 at 20-21.)
When counsel for the Bardorfs had presented his arguments in favor of the application, Mr. Lloyd renewed his argument that "putting 25 feet of building" on the location of the Bardorfs' existing deck would increase or intensify the dimensional non-conformity associated with lot coverage. (Tr. 10/11/07 at 23.) The Members of the Board then returned to the notice issue raised by Mr. Lloyd at the outset, and voted unanimously to proceed with the hearing. (Tr. 10/11/07 at 27.)
Following the vote, Mark Bardorf ("Mr. Bardorf") was sworn as a witness. (Tr. 10/11/07 at 27.) Mr. Bardorf testified that he and his wife gave "precise instructions" to their architect to *Page 13 
design the proposed addition so as to avoid "zoning issues," and that the completed plans conformed to the requirements of the Newport Code. (Tr. 10/11/07 at 29.) Mr. Bardorf indicated that the Newport Historic District Commission had evaluated the plans, and found that the proposed addition to his home was "compatible with the neighborhood, with the structures, and the features of the home itself." Id. Counsel for the Bardorfs then introduced the plans into evidence in order to demonstrate that the proposed addition would be built within the setback, and that demolition of the existing deck and construction of the addition would result in an overall decrease in lot coverage. (Tr. 10/11/07 at 30-31.)
The Zoning Board next heard testimony from Peter Scotti ("Mr. Scotti"), a real estate expert who had previously appeared before the Board. (Tr. 10/11/07 at 41.) Mr. Scotti testified that he was familiar with the Bardorfs' application and the requested relief, and that he had inspected the property. (Tr. 10/11/07 at 42-43.) Mr. Scotti indicated that the City of Newport's Department of Planning, Zoning, Development, and Inspection had approved the site plans prepared by the Bardorfs' architect, finding that they were consistent with the Comprehensive Plan. (Tr. 10/11/07 at 43.) On direct examination by counsel for the Bardorfs, Mr. Scotti stated that "[t]he size and use of the property is consistent with the established uses in the neighborhood," that "[t]he proposed use falls within all setbacks," and that "[t]he proposed use actually lessens the non-conformity of the subject [property] as it exists today." (Tr. 10/11/07 at 44.) Mr. Scotti stressed that lot size and setbacks would remain unaltered, and that "the footprint of lot coverage" would decrease by approximately two percent. Id.
With respect to the standard for granting special use permits set forth in § 17.108.020(G) of the Newport Code, Mr. Scotti testified that the Bardorfs' application was fully consistent with the seven enumerated factors. Id. Mr. Scotti also testified that the granting of the Bardorfs' *Page 14 
application would not be "injurious to the neighborhood or detrimental to the public welfare," and would be consistent with the Comprehensive Plan. (Tr. 10/11/2007 at 45.) On questioning by Mr. Lloyd, Mr. Scotti testified that the Bardorfs' proposed addition "is allowed by right under [the] Code. The addition is going to fall within all the setbacks, the lot coverage is going to decrease." (Tr. 10/11/07 at 49.) At the conclusion of Mr. Scotti's testimony, the Board adjourned until October 22, 2007.
At the October 22nd hearing, Mr. Lloyd renewed his argument that an increase in a structure's "building envelope" — even in the absence of a corresponding increase in the structure's "footprint" — increases or intensifies a dimensional non-conformity with respect to lot building coverage. (Tr. 10/22/07 at 6.) As Mr. Lloyd explained,
 If you [have] a 14-foot high garage, and you want to replace it and put in a 12-foot high garage, you can do that as of right. If you want to put a 16-foot high garage, that's an intensification. In this case, what is being taken away is a 1-foot high deck; and what is being put in place is a 28-foot high building. So, as far as I can tell, the Applicant is not in [the section of § 17.72.030 governing alteration of a dimensionally non-conforming structure as a matter of right]. (Tr. 10/22/07 at 6-7.)
Mr. Lloyd then called William Coyle III ("Mr. Coyle"), a real estate expert, as a witness. Mr. Coyle testified that, prior to testifying before the Board, he had had occasion to review the Comprehensive Plan for the City of Newport, the relevant sections of the Newport Code, and the application and plans submitted by the Bardorfs. (Tr. 10/22/07 at 10.) According to Mr. Coyle, the addition proposed by the Bardorfs would obstruct the amount of sunlight reaching the first floor of the Appellants' home, a partial view of Narragansett Bay from the second floor, and an "expansive" water view from the third floor. (Tr. 10/22/07 at 15.) As such, construction of the proposed addition would have a detrimental impact on the valuation of the Appellants' property. *Page 15 Id. In Mr. Coyle's professional opinion, the proposed addition would not "be in harmony with the surrounding area" based on its negative impact on home valuations. (Tr. 10/22/07 at 18.)
On cross-examination by counsel for the Bardorfs, Mr. Coyle was asked how lot building coverage is calculated in Newport. While Mr. Coyle stated that lot building coverage refers to both "the actual square footage on the ground, the ground calculation, [and] . . . the mass and the size of the object that is going to be placed on that," he admitted that the special use permit application promulgated by the City "only speak[s] to the [structure's] footprint." (Tr. 10/22/07 at 27-28.) When pressed by counsel as to whether "building up within [the existing] footprint is . . . harmful for the rest of the neighborhood," Mr. Coyle answered in the negative. (Tr. 10/22/07 at 29.)
Following Mr. Coyle's testimony, Mr. O'Connell explained that lot building coverage has "nothing to do with the [building's] envelope." (Tr. 10/22/07 at 39.) Mr. O'Connell stated that "[t]he proposal conforms to all minimum setback requirements," and that "[t]he actual lot coverage will be decreased by two percentage points. . . . The lot will be made slightly more conforming, there is less lot coverage variation. . . ." Id. Based on his characterization of "lot building coverage" as a separate and distinct concept from "building envelope," Mr. O'Connell asked Mr. Lloyd whether lot coverage would decrease if the Bardorf application were approved; Mr. Lloyd answered in the affirmative. (Tr. 10/22/07 at 44.)
Following the public hearings on the Bardorfs' application, the members of the Board discussed their individual views of the proposal. Board Member Martin Cohen stated that "[t]he burden is more than met by the [Bardorf] proposal," and expressed his intention to vote in favor of the application. (Tr. 10/22/07 at 59.) Mr. Abney also looked favorably upon the Bardorf application, stating that the Bardorfs' proposed addition would not be "injurious to the *Page 16 
neighborhood," and that there would be no adverse impact on the Lloyds' water view. (Tr. 10/22/07 at 61.) Ms. Minifie found that the Bardorfs "met the burden of proof for the special use permit and variance to the dimensional requirements." (Tr. 10/22/07 at 62.) Ms. Minifie stated that the proposed "modifications are in harmony with the neighborhood," that "the lot is actually being made more conforming," and that "the actual lot coverage will decrease." Id. Board Member Mary Joan Hoene ("Ms. Hoene") stated that "the special use sought [by the Bardorfs] is within the general character of the neighborhood," and that the prior approval of the Newport Historical Commission was a "compelling" reason to vote in favor of the application. (Tr. 10/22/07 at 63.) Finally, Mr. O'Connell stated that non-conforming structures should be altered only by way of special use permit, and that the process "never should have anything to do with dimensional relief." Id. He agreed with Ms. Hoene that the Newport Historical Commission's consideration of "neighborhood harmony, . . . historical harmony, the structure's massing," and ultimate decision to approve the proposed addition militated in favor of granting the Bardorfs' application. (Tr. 10/22/07 at 65.)
The Board then voted unanimously to grant the application for a special use permit. The Board did not vote on the Bardorfs' application for dimensional relief. In rendering its written decision, issued on November 28, 2007, the Board made the following findings of fact:
 2. "[T]he use and the proposed changes to the Property are compatible with the neighborhood and the neighboring properties;
 4. The improvements to the Property will be an appropriate size and scale as shown on the plans and by the approval of the Newport Historic District Commission. The proposed changes are in harmony with the surrounding area;
 5. Parking on site as proposed is sufficient to meet the residential use and the improvements will not cause a greater need for parking nor will it impact the traffic to and from the Property; *Page 17 
 6. There will be no negative impact on the area or the surrounding residential uses;
 7. The percentage of lot coverage will decrease as a result of the improvement to the structure and all improvements will conform to all minimum setback requirements;
 8. . . . The proposed alterations of the structure on the Property conform to current dimensional requirements of the R-10 zone and do not increase or intensify the elements of the Property's dimensional non-conformities (lot coverage, frontage setback, and lot area);
 9. The proposed use of the second floor deck/balcony off the master bedroom is a inconsequential change to the structure;
 10. The proposed changes to the Property are in compliance with the . . . Comprehensive Plan and . . . provisions of the Newport Zoning Ordinance;
 11. The proposed changes to the Property are in accord with the public convenience and welfare . . .
Following the issuance of the Board's written decision, the Lloyds filed a timely appeal to this Court on November 29, 2007.
 II Standard of Review
The Superior Court's review of a zoning board's decision is governed by § 45-24-69(d), which provides:
 The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law; *Page 18 
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
The Court's review of the Board's decision is not de novo. SeeMonroe v. Town of East Greenwich, 733 A.2d 703, 705 (R.I. 1999) (recognizing "`traditional judicial' review standard that is applied in administrative-agency actions"). Instead, its appellate review is limited to an examination of "`the entire record to determine whether `substantial' evidence exists to support the board's findings.'"Mill Realty Assocs. v. Crowe, 841 A.2d 668, 672 (R.I. 2004) (quotingDeStefano v. Zoning Bd. of Review, 122 R.I. 241, 241, 405 A.2d 1167,1170 (1979)). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, [or an] amount more than a scintilla but less than a preponderance." Lischio v. Zoning Bd. of Review of North Kingstown,818 A.2d 685, 690 (R.I. 2003) (quoting Caswell v. George Sherman Sand andGravel Co., 424 A.2d 646, 647 (R.I. 1981)). Should the Court find that competent evidence exists in the record to support the Board's findings, its decision must be affirmed. Monroe, 733 A.2d at 705.
 III Analysis A Special Use Permit Standard
Under the Rhode Island Zoning Enabling Act of 1991, local zoning ordinances must provide for the issuance of special use permits, to be approved by the zoning board of review. Such ordinances must, in addition to establishing procedural requirements for obtaining special use permits: (1) specify the uses requiring special use permits in each district; (2) describe the conditions and procedures under which special use permits of each of the various categories of such permits established in the zoning ordinance may be issued; and (3) establish criteria, *Page 19 
consistent with the purposes and intent of the city or town's comprehensive plan and zoning ordinance, for issuance of each category of special use permit. See G.L. 1956 § 45-24-42. The burden of proof in a special use permit application is on the applicant, meaning that if the applicant fails to present adequate competent evidence to prove that the applicable standard for issuing a special use permit has been met, the zoning board of review must deny the application. See Toohey v.Kilday, 415 A.2d 732 (R.I. 1980).
The purpose of the special use permit in the context of zoning is to establish within a local zoning ordinance "conditionally permitted" uses. See Westminster Corp. v. Zoning Bd. of Review, 103 R.I. 381,238 A.2d 353 (1968). The fact that a particular use is allowed in a zoning district by special use permit means that the municipal council has already determined that it is an appropriate use for the district,see Nani v. Zoning Bd. of Review, 104 R.I. 150, 242 A.2d 403 (1968), and it cannot be excluded by a decision of a zoning board of review unless the standards for the special use permit are not satisfied with its establishment at a particular location or site. See Perron v. Zoning Bd.of Review of Burrillville, 117 R.I. 571, 369 A.2d 638 (1977)
The rules and standards governing the exercise of the Zoning Board's authority to grant special use permits are found in §§ 17.72.030 and 17.108.020 of the Newport Code. These standards are conditions precedent to an exercise by the Board of its authority to act affirmatively on an application for a special use permit. See Guiberson v. Roman CatholicBishop of Providence, 112 R.I. 252, 308 A.2d 503 (1973). Where the conditions and requirements are satisfied, it is an abuse of discretion to deny the requested special use permit. See Salve Regina v. Zoning Bd.of Review of Newport, 594 A.2d 878 (R.I. 1991).
Pursuant to § 17.72.030(C) of the Newport Code, the owner of a "dimensionally non-conforming structure[] that otherwise conform[s] to the use regulations of the zoning district *Page 20 
shall be allowed as a matter of right" to alter the structure "if the alteration in and of itself (1) conforms to the current dimensional requirements of the zoning district in which the property is located; and (2) does not increase or intensify the element(s) of the dimensional nonconformity." In order to construct a proposed deck or "enlarge[] or subject to addition or intensification" a dimensionally non-conforming structure "with respect to its non-conforming element(s)," the property owner must obtain a special use permit from the zoning board of review.Id. In exercising its authority to grant special use permits, the zoning board must find "that the proposed use or the proposed extension or alteration of an existing use is in accord with the public convenience and welfare, after taking into account, where appropriate," the seven factors set forth in § 17.108.020(G) of the Newport Code.
 B Analysis of Board's Decision on the Lloyd Application
Before this Court, Mr. Lloyd argues that the Zoning Board's decision on his special use permit application is in violation of ordinance provisions, in excess of the authority granted to the zoning board of review by ordinance, affected by error of law, and characterized by abuse of discretion. Specifically, Mr. Lloyd contends that the Board, in considering his application, misapplied the Newport Code in order to require a dimensional variance in conjunction with a special use permit. Additionally, Mr. Lloyd maintains that there was reliable, probative, and substantial evidence before the Zoning Board that the seven factors governing the granting of special use permits set forth in § 17.108.020 of the Newport Code had been satisfied and, as such, it was an abuse of the Board's discretion to deny his application. *Page 21 
 1 Application for Dimensional Relief in Conjunction with Special Use Permit
As his first argument on appeal, Mr. Lloyd argues that the Zoning Board's decision on his application is in violation of ordinance provisions and in excess of the authority granted to the Board by the Newport Code. Specifically, Mr. Lloyd asserts that the Board misapplied the Newport Code to require him to seek dimensional relief in conjunction with his application for a special use permit.
Section 45-24-42(a) of the General Laws reads, in pertinent part, that the "zoning ordinance shall provide for the issuance of special use permits approved by the zoning board of review." With respect to granting a dimensional variance along with this type of zoning relief, a zoning board's authority is defined and limited by § 45-24-42(c), relating to special use permits, and § 45-24-41(d)(2), pertaining to variances. The former of these statutory provisions reads as follows:
 The ordinance additionally may provide that an applicant may apply for, and be issued, a dimensional variance in conjunction with a special use. If the special use could not exist without the dimensional variance, the zoning board of review shall consider the special use permit and the dimensional variance together to determine if granting the special use is appropriate based on both the special use criteria and the dimensional variance evidentiary standards. (Emphasis added.)
Section 45-24-41(d)(2) provides: "The zoning board of review has the power to grant dimensional variances where the use is permitted by special use permit if provided for in the special use permit sections of the zoning ordinance."
The above provisions were incorporated into the General Laws after our Supreme Court commented that "a dimensional variance [may] be granted only in conjunction with the enjoyment of a legally permitted beneficialuse, not in conjunction with a use granted by special *Page 22 
permit." See Newton v. Zoning Bd. of Review of Warwick, 713 A.2d 239,242 (R.I. 1998) (emphasis in original). Based on the foregoing, it is clear that the General Assembly intended that a special use only could co-exist with a dimensional variance when the municipality's zoning ordinance so provides. See Oliveira v. Lombardi, 794 A.2d 453, 457 (R.I. 2002) ("When construing a statute [the] ultimate goal is to give effect to the purpose of the act as intended by the Legislature. . . .") Consequently, the Newport Code will dictate whether both forms of relief may be granted at the same time.
Section 17.108.020 of the Newport Code sets forth the process through which a special use permit is granted. That section provides as follows:
 Special use permits shall be granted only where the zoning board of review finds that the proposed use or the proposed extension or alteration of an existing use is in accord with the public convenience and welfare, after taking into account, where appropriate:
 1. The nature of the proposed site, including its size and shape and the proposed size, shape and arrangement of the structure;
 2. The resulting traffic patterns and adequacy of proposed off-street parking and loading;
 3. The nature of the surrounding area and the extent to which the proposed use or feature will be in harmony with the surrounding area;
 4. The proximity of dwellings, churches, schools, public buildings and other places of public gathering;
 5. The fire hazard resulting from the nature of the proposed buildings and uses and the proximity of existing buildings and uses;
 6. All standards contained in this zoning code;
 7. The comprehensive plan for the city.
It is clear from the above-quoted language that the special use permit section of the Newport Code does not expressly allow a special use permit and dimensional variance to be issued in conjunction with each other. Although the General Assembly has authorized municipalities throughout Rhode Island to consider both forms of zoning relief simultaneously, the City of Newport has yet to amend its ordinance to permit this action by the Zoning Board. *Page 23 
Consequently, as the Newport Code does not expressly permit the granting of a special use permit in conjunction with a dimensional variance, this Court is satisfied that the Zoning Board exceeded its authority in requiring Mr. Lloyd to produce evidence that the hardship caused by their existing restrooms amounted to "more than a mere inconvenience" and that he was seeking the least dimensional relief necessary. This action by the Board was completely at odds with the plain and clear language of the Newport Code.
 2 Sufficiency of Board's Decision on the Lloyd Application
Next, Mr. Lloyd contends that the Board's decision on his special use permit application is characterized by abuse of discretion and clearly erroneous in light of the reliable, probative, and substantial record evidence. It is Mr. Lloyd's contention that he presented sufficient legally competent evidence at the public hearing — including extensive testimony by his real estate expert — to prove that the applicable standard for issuing a special use permit had been met. As such, he maintains that it was an abuse of discretion for the Board to deny the application.
It is well-settled in Rhode Island that "there is no talismanic significance to expert testimony. It may be accepted or rejected by the trier of fact[.]" Restivo v. Lynch, 707 A.2d 663, 671 (R.I. 1998) (citing Kyle v. Pawtucket Redevelopment Agency, 106 R.I. 670, 673,262 A.2d 636, 638 (1970)). However, it is equally well-settled that "if expert testimony before a zoning board is competent, un-contradicted, and un-impeached, it [is] an abuse of discretion for [the] zoning board to reject such testimony." Murphy v. Zoning Bd. of Review of SouthKingstown, 959 A.2d 535, 542 (R.I. 2008) (citing Bonitati Bros., Inc. v.Zoning Bd. of Review of Cranston, 99 R.I. 49, 55, 205 A.2d 363, 366-67
(1964)).
Here, Mr. Lloyd places considerable weight on the testimony of his real estate expert, Mr. Durgin, who testified that the proposed second-and third-story addition to his dimensionally *Page 24 
non-conforming structure would be in harmony with the surrounding area, and would not, by virtue of its close proximity to the Flynns' carriage house/apartment, have an adverse impact on the amount of light and air reaching the Flynns' property. (Tr. 5/22/06 at 48-51.) However, Mr. Flynn testified, based on his extensive knowledge of the property located at 14 Chestnut Street, that the proposed addition would, by virtue of its sheer size and shape, "overwhelm" his property and have an adverse impact on the amount of light and air reaching his property. (Tr. 5/22/06 at 79.) The Board heard testimony from Mr. Flynn that the windows of his carriage house/apartment are shadowed for much of the day by the current arrangement of Mr. Lloyd's structure, and that the addition of two additional floors would result in far greater obscuration of his sunlight. Id. The Board also heard testimony from Mr. Flynn that the roof of his carriage house had been specifically designed to facilitate the free flow of air, and that the proposed addition to Mr. Lloyd's structure would greatly diminish the effectiveness of this design feature. (Tr. 5/22/06 at 64, 79.)
As our Supreme Court reaffirmed in Murphy, "[i]t should go without saying that expert testimony proffered to a zoning board is not somehow exempt from being attacked in several ways." Id. at. 542 n. 6 (citingEast Bay Community Development Corp. v. Zoning Bd. of Review ofBarrington, 901 A.2d 1136, 1157 (R.I. 2006) (countenancing a challenge to expert testimony on the basis of the personal knowledge and observations of the members of the zoning board so long as there are adequate disclosures on the record); Restivo, 707 A.2d at 671 (noting that expert testimony can be discredited through examination of the expert by members of the zoning board or by counsel for an interested party). Accordingly, while the Board could have accepted the proffered expert testimony of Mr. Durgin, it chose to disregard it because "there [wa]s *Page 25 
persuasive lay testimony [from Mr. Flynn] on the actual observed effects of prior residential construction" on Mr. Lloyd's property.Restivo, 707 A.2d at 671.
Since the lay testimony offered by Mr. Flynn was formed from the perspective of a neighboring property owner who has been living in the shadow — both literal and figurative — of Mr. Lloyd's home since 1984, (Tr. 5/22/06 at 61), the Board properly found that his testimony regarding the size, shape, and arrangement of Mr. Lloyd's existing home and proposed addition, the proximity of the proposed addition to his carriage house/apartment, and the negative impact on his sunlight and air was competent, persuasive and entitled to more probative force than that of Mr. Durgin. As Mr. Flynn's testimony constitutes evidence from which the Zoning Board could fairly draw inferences, this Court is satisfied that there is substantial record evidence that Mr. Lloyd's application was not "in accord with the public convenience and welfare, after [the Board] t[ook] into account" the size of the addition and its substantial effect on surrounding properties. See Newport Code §§ 17.108.020(G). Accordingly, this Court holds that the Zoning Board's decision on Mr. Lloyd's application is not characterized by abuse of discretion or clearly erroneous based on the record evidence.
 C Analysis of Board's Decision on the Bardorf Application
With respect to the Board's decision on the Bardorf application, the Lloyds assert that it is in violation of ordinance provisions, affected by error of law, and clearly erroneous in light of the reliable, probative, and substantial record evidence. Specifically, the Lloyds maintain that the Board erred in failing to require the Bardorfs to obtain a dimensional variance in addition to a special use permit in order to "alter[], change[], enlarge[] or subject to addition or intensification" their dimensionally non-conforming structure by adding a second-floor deck. The Lloyds also contend that the Zoning Board erred in finding that the Bardorfs were allowed to *Page 26 
alter their dimensionally non-conforming structure "as a matter of right" because the proposed two-story addition represents a "significant intensification" of the existing dimensional nonconformity associated with lot building coverage. Finally, the Lloyds assert that the Board's decision on the Bardorf application is unsupported by the record evidence.
 1 Application for Dimensional Relief in Conjunction with Special Use Permit
As their first argument on appeal of the Board's decision on the Bardorf application, the Lloyds assert that the Zoning Board misapplied the Newport Code in failing to require the Bardorfs to seek dimensional relief in conjunction with their application. However, as this Court explained in its consideration of the Lloyd application, the General Assembly intended that a special use could co-exist with a dimensional variance only when the municipality's ordinance so provides. Thus, as the Newport Code is silent as to the availability of this combined relief, this Court finds that the Zoning Board's failing to apply the dimensional variance standard articulated in Viti and its progeny to the Bardorf application was not affected by error of law.
 2 Intensification of "Lot Building Coverage"
The Lloyds next argue that the Board's decision is in violation of ordinance provisions because the Board erred in allowing the Bardorfs to avail themselves of the section of the Newport Code that allows for alteration of dimensionally non-conforming structures "as a matter of right." Newport Code § 17.72.030(C). The Lloyds maintain that the Bardorfs cannot alter their dimensionally non-conforming single-family dwelling "as a matter of right" because the proposed two-story addition would "increase or intensify" the existing non-conformity associated with lot building coverage. In effect, the Lloyds assert that an increase in square footage of a structure's "building envelope," as that term is contemplated by the Newport Code, *Page 27 
is the functional equivalent of an increase in a structure's "lot building coverage," even if there is no corresponding change in the structure's "footprint." According to the Lloyds' construction of "lot building coverage," each floor of a proposed addition must be taken into consideration when calculating the portion of the lot covered by buildings.
It is well-established that the rules of statutory construction apply with equal force to the construction of zoning ordinances. SeePawtucket Transfer Operations, LLC v. City of Pawtucket, 944 A.2d 855,859 (R.I. 2008). Thus, this Court must "give clear and unambiguous language in an ordinance its plain and ordinary meaning." Id. (citingPark v. Rizzo Ford, Inc., 893 A.2d 216, 221 (R.I. 2006)). However, when interpreting the language of an ordinance that is unclear and ambiguous, the Court must "establish[] and effectuate[] the legislative intent behind the enactment." Id. (quoting State v. Fritz, 801 A.2d 679, 682
(R.I. 2002)). It has been consistently held that "statutory definitions are themselves an indication of legislative intent, and this court will ordinarily give strict meaning to those definitions." Town of Scituatev. O'Rourke, 103 R.I. 499, 512, 239 A.2d 176, 184 (1968). However, this Court will not construe an ordinance to achieve an absurd result.Beaudoin v. Petit, 122 R.I. 469, 476, 409 A.2d 536, 540 (1979). It follows that if a mechanical application of a definition produces an absurd result or defeats legislative intent, this Court will look beyond mere semantics and give effect to the purpose of the act. State v.Delaurier, 488 A.2d 688, 693 (R.I. 1985).
Section 17.08.010 of the Newport Code defines the term "building envelope" as "the three-dimensional space within which a structure is permitted to be built on a lot and which is defined by regulations governing building setbacks, maximum height, and bulk." By contrast, "lot building coverage" is defined as "that portion of the lot that is or may be covered by buildings and accessory buildings." These definitions mirror language from G.L. 1956 § 45-24-31, *Page 28 
the definitional section of the Rhode Island Zoning Enabling Act. As the General Assembly saw fit to define these terms in the Enabling Act, this Court will treat those definitions as binding. See O'Rourke,103 R.I. at 512, 239 A.2d at 184.
Based on the unambiguous language of § 17.08.010 of the Newport Code and its corollary, § 45-24-31 of the general laws, it is clear that the drafters of the Code did not intend for the terms "building envelope" and "lot building coverage" to be employed interchangeably. "Lot building coverage" is a two-dimensional concept, encompassing the total area of the lot covered by buildings and accessory buildings; it does not contemplate a vertical dimension. This construction is consistent with the Newport Code's definition of "lot" as "[a] parcel of land whose boundaries have been established by some legal instrument. . . ." Newport Code § 17.08.010. (Emphasis added) To construe the term "lot building coverage" to refer to the portion of airspace above the parcel of land "covered" by buildings would result in absurdities.See
Despite Mr. Lloyd's and his real estate expert's insistence during the public hearings on the Bardorfs' application that the destruction of the Bardorfs' existing addition and one-story deck and the construction of a two-story addition would result in an "increase or intensification" of the home's dimensional non-conformity associated with lot coverage, (Tr. 10/11/07 at 7-8, 23, Tr. 10/22/07 at 6, 27-28.), at least two members of the Board were unwilling to accept his argument that "building envelope" and "lot building coverage" are synonymous and, as such, an increase in the three dimensional space to be occupied by the Bardorfs' proposed addition would "increase or intensify" the "portion of the [Bardorfs'] lot that is . . . covered by buildings." (Tr. 10/11/07 at 8, Tr. 10/22/07 at 39.) The Board chose to credit the testimony of Mr. Bardorf and his real estate expert that the proposed two-story addition would result in an overall decrease in *Page 29 
"lot coverage," even though it would undoubtedly result in an overall increase in the "bulk" of the Bardorfs' home. (Tr. 10/11/07 at 30-31, 44, 49.)
Accordingly, the Board's decision to allow the Bardorfs to alter their dimensionally non-conforming home "as a matter of right" based on the testimony of Mr. Bardorf and his real estate expert was not, as the Lloyds contend, in violation of ordinance provisions. Indeed, assumingarguendo that the Board adopted the Lloyds' proffered constructions of "lot building coverage" and "building envelope," the Lloyds' own proposed two-story addition would fail to pass muster under the Newport Code, as it would "increase or intensify" the structure's existing dimensional non-conformity with respect to lot coverage by expanding the home's "envelope" beyond its existing parameters.
 3 Sufficiency of Board's Decision on the Bardorfs'Application
Finally, the Lloyds argue that the Board's decision on the Bardorfs' application is clearly erroneous in light of the reliable, probative, and substantial record evidence. Having reviewed the entire record before it, however, this Court is satisfied that the Board's decision on the special use permit application is amply supported by legally competent record evidence.
The record reflects that the Bardorfs' real estate expert testified that the proposed size, shape, and arrangement of the Bardorfs' addition "[wa]s consistent with the established uses in the neighborhood[,]" while the Lloyds' real estate expert testified that the construction of a two-story addition to the rear of the Bardorfs' home would not, by virtue of its size and shape, be "in harmony with the surrounding area" and would negatively affect home valuations in the neighborhood. (Tr. 10/11/07 at 44, Tr. 10/22/07 at 15, 18.) Essentially, the members of the Board were faced with a "battle of the experts" and, after careful consideration, made an informed and record-supported decision after reviewing the conflicting expert testimony that the *Page 30 
requirements of § 17.108.020(G)(1) of the Newport Code had been satisfied. See
The Zoning Board also found, based on the evidence and testimony adduced at the two public hearings on the Bardorfs' application, that the proposed addition was consistent with "[a]ll standards contained in [the] zoning code." Newport Code § 17.108.020(G)(6). The Board heard voluminous testimony from the Lloyds and their real estate expert that the proposed two-story addition to the Bardorfs' dimensionally non-conforming structure should not be allowed "as a matter of right" because the resulting increase in square footage of the home's "envelope" would equate to an intensification of the existing dimensional non-conformity with respect to "lot building coverage." (Tr. 10/11/07 at 7, 23, Tr. 10/22/07 at 6-7, 27-28.) However, the Board made clear that "lot building coverage" and "building envelope" are not functionally equivalent terms under the Newport Code, and that an increase in the square footage of a structure does not, without a corresponding increase in the structure's "footprint," result in an increase or intensification of the structure's "lot building coverage." (Tr. 10/11/07 at 8, Tr. 10/22/07 at 39, 44.) Accordingly, this Court will "give weight and deference to [the] [Z]oning [B]oard's interpretation and application of the [Newport Code], [as] its construction is not clearly erroneous or unauthorized." Cohen v.Duncan, 970 A.2d 550 (R.I. 2009) (citing Pawtucket Transfer Operations,LLC v. City of Pawtucket, 944 A.2d 855, 859-860 (R.I. 2008)).
Based on the testimony of the Bardorfs' real estate expert, the Board found that the plan proposed by the Bardorfs was consistent with the ordinance provisions governing the R-10 residential district. The Bardorfs' expert stated that "[t]he size and use of the property is consistent with the established uses in the neighborhood," that "[t]he proposed use falls within *Page 31 
all setbacks," and that "[t]he proposed use actually lessens the non-conformity of the subject [property] as it exists today." (Tr. 10/11/07 at 44.) The Bardorfs' expert further stressed that existing dimensional non-conformities with respect to lot size and setbacks would remain unaltered, and that "the footprint of lot coverage" would decrease by approximately two percent. Id. While the Lloyds' real expert testified that the proposed addition would intensify the existing dimensional non-conformity with respect to lot building coverage, the Board chose not to rely on this testimony. (Tr. 10/22/07 at 27-28, 39.) Indeed, the Board satisfied itself that "[t]he proposal conforms to all minimum setback requirements," and that "[t]he actual lot coverage will be decreased by two percentage points. . . . The lot will be made slightly more conforming, there is less lot coverage variation. . . ." (Tr. 10/22/07 at 39.) See Lowry, 500 A.2d at 952.
Focusing on the relationship between the Bardorfs' proposed addition and the nature of the surrounding area, the Board found that the two-story addition was "in harmony with the surrounding area." Newport Code § 17.108.020(G)(3). The Board chose to credit Mr. Bardorf's testimony that the Newport Historic District Commission had evaluated the plans, and found that the proposed addition was "compatible with the neighborhood, with the structures, and the features of the home itself." (Tr. 10/11/07 at 29.) While the Lloyds' real estate expert maintained that the proposed addition to the Bardorfs' single-family dwelling would have an adverse impact on home valuations in the surrounding area, (Tr. 10/22/07 at 18.), the Board did not abuse its discretion in relying on other evidence before it, namely crediting the findings of the Newport Historical District Commission.
The Zoning Board also found, based on the expert testimony of Mr. Scotti, that the Bardorfs' proposed addition was in accord with the Comprehensive Plan. Newport Code § 17.108.020(G)(7). The record reflects that there is un-controverted testimony from Mr. Scotti *Page 32 
that the City of Newport's Department of Planning, Zoning, Development, and Inspection had reviewed site plans prepared by the Bardorfs' architect and determined that the plans were fully consistent with the Comprehensive Plan. (Tr. 10/11/07 at 43.) As this competent testimony of Mr. Scotti was not attacked or otherwise impeached during the course of the public hearing, the Zoning Board's decision to rely on his testimony is not affected by error or law and does not constitute an abuse of the Board's discretion. See Murphy, 959 A.2d at 542.
Based on the totality of the testimony and evidence adduced by Mr. Bardorf and his real estate expert over the course of two public hearings, the members of the Zoning Board unanimously found that the Bardorfs' application met or exceeded the required standards set forth in § 17.108.020(G). See Bardorf Dec. at 3. The Board's determination that "the relief sought [wa]s reasonably necessary for the convenience and welfare of the public," Salve Regina College, 594 A.2d at 880, is amply supported by reliable, probative, and substantial record evidence. Accordingly, the Board's finding that "neither the proposed use nor its location on the site would have a detrimental effect upon public health, safety, welfare and morals," Guiberson, 112 R.I. at 260,308 A.2d at 507, is not clearly erroneous.
 IV Conclusion
With regard to Mr. Lloyd's appeal of the Board's denial of his application, this Court will affirm the Board's decision on appeal. While this Court is mindful that the Zoning Board acted in excess of its authority by requiring Mr. Lloyd to apply for a dimensional variance in conjunction with a special use permit, this Court is nevertheless satisfied that Mr. Lloyd was not substantially prejudiced thereby because the Board's decision on his special use permit application is in accordance with all applicable provisions of the Newport Code and based upon reliable, probative, and substantial record evidence. With regard to the Board's decision on the *Page 33 
Bardorfs' application, this Court will affirm that decision on appeal, as it rests on foundation of reliable, probative, and substantial record evidence, is not otherwise affected by error of law, and is in compliance with all applicable ordinance provisions. Accordingly, the Lloyds' appeals are denied. Substantial rights of the Lloyds have not been prejudiced.
Counsel shall submit the appropriate judgments for entry.
[1] The two appeals before this Superior Court were consolidated by an Order of this Court entered on October 8, 2008.
[2] The term "non-conforming by dimension" is defined in the Rhode Island Zoning Enabling Act of 1991 as "a building, structure, or parcel of land not in compliance with the dimensional regulations of the zoning ordinance. Dimensional regulations include all regulations of the zoning ordinance, other than those pertaining to the permitted uses." G.L. 1956 § 45-24-31(49)(b). "[Z]oning requirements pertaining to lot size, setbacks, building heights, and parking are encompassed within this definition." Roland F. Chase, Rhode Island Zoning Handbook, § 69 at 74.
[3] According to the Memorandum of Law submitted by Mr. Lloyd, his single-family dwelling is dimensionally non-conforming as to lot building coverage (31% where 20% is the maximum portion of a lot to be covered by buildings), building height (40 feet where 30 feet is the maximum building height), and east side line setback (3 feet where 10 feet are required). (Lloyd Mem. at 8.)
[4] Section 17.72.030(C) of the Newport Code reads, in pertinent part:
 A structure or land which is non-conforming by dimension, but the use of which is a use permitted by right in the district in which the land or structure is located, shall only be altered, changed, enlarged or subject to addition or intensification with respect to its non-conforming element(s) by obtaining a special use permit from the zoning board of review.
[5] Black's Law Dictionary defines the term "footprint" as "[t]he shape of a building's base." Black's Law Dictionary 672 (8th Ed. 2004).
[6] In their Memorandum of Law, the Lloyds assert that their proposed addition would also increase the existing dimensional non-conformity with respect to "lot building coverage" by expanding their home's "building envelope." (Lloyds' Mem. at 6.) However, the Lloyds also assert that the proposed two-story addition would be built within the existing "footprint" of the structure. (Lloyds' Mem. at 3.) As will be made clear in this Court's consideration of the Bardorf appeal, the terms "lot building coverage" and "building envelope" are not synonymous and cannot be used interchangeably.
[7] From his discussion of the "more than a mere inconvenience" standard, it is clear that Mr. O'Connell was applying the well-established dimensional variance standard of Viti v. Zoning Bd. ofReview of Providence, 92 R.I. 59, 166 A.2d 211 (1960).
[8] The Bardorfs indicated in their Memorandum of Law that their single-family residence is dimensionally non-conforming as to lot size, lot coverage, and front line setback. (Bardorfs' Mem. at 4.)
[9] All abutting landowners received a notice that stated:
 PETITION OF MARK DIANA BARDORF, applicants and owners; for a special use permit and a variance to the dimensional requirements for permission to modify an existing non-conforming structure by removing the existing addition and constructing a 22 ft. x. 34 ft. addition which will increase (sic.) the lot coverage from 36% to 34% (20% allowed) applying to the property located at 18 Chestnut St., TAP 23, Lot 249, (R-10 zone). (Zoning Board Dec. at 1.)