DECISION
In this zoning appeal, Denise DeCaporale and Irene Lusignan ("Appellants") challenge the Decision of the Zoning Board of Review for the Town of Narragansett ("Decision" or "Board's Decision"), denying their request for a special use permit and dimensional variance necessary for the construction of a single-family residence on their property. Appellants specifically allege that the Board's Decision does not contain the prerequisite factual determinations, apply the proper legal principles, or elucidate what evidence it relied upon in reaching its conclusion. Jurisdiction is pursuant to G.L. 1956 § 45-24-69. For the reasons set forth in this Decision, this Court affirms the Decision of the Board.
 I FACTS AND TRAVEL
Appellant owners propose to construct a twenty-four foot by twenty-eight foot dwelling on the property located on Palm Beach Avenue in Narragansett, Rhode Island (the "property"). The property, identified as Lot 231 on Tax Assessor's Plat Y-3, is a substandard lot of record[1] within a Coastal and Freshwater Wetlands Overlay District *Page 2 
("wetlands district"). Within a wetlands district, proposed development must comply with nine developmental standards set forth in §§ 4.3(4)(a)-(i) of the Town of Narragansett Zoning Ordinance (the "Ordinance").[2] A proposal[3] that does not meet these standards must receive a special use permit.[4]
Ordinance § 4.3(3).
Appellants' initial application for a building permit was denied because Appellants' plan did not comply with the requirements of § 4.3(4) for construction within a wetlands district or the dimensional setback requirements of § 6.5[5]. Section 4.3(4)(a) requires that structures be set back one hundred feet from the wetland edge. Because Appellants' land is roughly ninety-eight percent wetland containing only 140 square feet of upland area, Appellants were unable to locate the proposed structure one hundred feet or more from the edge of the wetland. The property simply lacks the upland area to support such a setback. In fact, in its current condition, the property lacks sufficient upland area to support the proposed structure at all. In order to create the necessary upland area, Appellants request that a portion of the wetland be filled. It is upon this newly filled wetland that Appellants propose to locate the structure.
In an effort to minimize the area needed to be filled, and thereby the impact to the wetland, Appellants sought to locate the structure fifteen feet closer to the road than § 6.5 *Page 3 
allows.[6] Nonetheless, even with the dimensional relief they requested, completion of the project as proposed would still have required the filling of approximately 2455 square feet of wetland, necessitating approval. (Tr. Narragansett Zoning Board of Review Hr'g, Nov. 20, 2008 at 15.)
After their request for a building permit was denied, Appellants applied to the Zoning and Planning Board of Review for a special use permit and a dimensional variance.[7] On November 20, 2008, the Board conducted a properly advertised hearing at which it considered evidence and heard testimony.
 A THE HEARING
At the hearing, the Board heard testimony from three expert witnesses proffered by the Appellants. Appellant DeCaporale and two lay witnesses also testified at the hearing.
Appellants' engineer, Craig Carrigan, testified that Appellants' property had been flagged as mostly wetland. Although not agreeing with the precise number in the Natural Resource Services report, Mr. Carrigan agreed that the property was approximately ninety-eight percent wetland. (Tr. Narragansett Zoning Board of Review Hr'g, Nov. 20, 2008 at 12.) He also verified Board Member O'Neill's personal observations of the site when during Mr. Carrigan's examination, Board Member O'Neill stated on the record: "I walked the property today and the front's under water, and as you go in there, it's a little hard with the briars, but it's very, very wet."Id. Mr. Carrigan responded, "Yes, it is." *Page 4 Id. Immediately whereafter, Board Member Goodrich remarked, "As you notice in the file it's going to require a lot of fill." Mr. Carrigan affirmed this observation and added that that the fill would be deposited "in the wetland."Id. (emphasis added).
Despite confirming the board members' observations that the property was "very, very wet" and stating that a lot of fill would need to be deposited "in the wetland" — a process that effectively eliminates approximately 2455 square feet of wetland — Mr. Carrigan testified that the impact to the wetland would be minimal to nonexistent. Id. It was his testimony that the project would not increase stormwater runoff to the adjacent sites[8], id. at 8, would not impact the adjacent wetlands' ability to retain stormwater runoff, id., would not obstruct any floodways, id., and would not reduce the net capacity of the site to retain floodwaters. Id. Additionally, Mr. Carrigan testified that the project would neither impact the capacity of the wetlands to absorb pollutants,id. at 9, nor its ability to recharge groundwater.Id. Specifically, on the point of sedimentation, Mr. Carrigan was asked, "have you addressed any sedimentations of the wetlands and erosions?" Id. at 8. He responded, "Yes. We are proposing to install a silt fence and/or straw bale barriers around theperimeter of the limits of disturbance."Id. (emphasis added). Mr. Carrigan's response, however, did not address the fact that within the perimeter of the limits of disturbance, a significant amount of fill would be deposited directly into the wetland itself. Finally, Mr. Carrigan testified that the project was in harmony with the general purpose and intent of the ordinance and, "to the maximum extent possible," was designed to protect the natural resources from overdevelopment in accordance with the comprehensive plan. See id. at 9. *Page 5 
Following Mr. Carrigan's testimony, Appellants' biologist, Joseph McCue, testified as to his company's, Natural Resource Services's, report on the property. Similar to the testimony given by Mr. Carrigan, Mr. McCue testified that although the property is ninety-eight percent wetland, and roughly one-third of it will be disturbed, this disturbance should have no ill effect on the wetland, the native species, or the surrounding area.Id. at 15-17. He further testified that the plan made efforts to provide for the least impact to biological value, and that the placement of the house closer to the road would minimize the impact to the wetland as that is the area that "will hold the least water."Id. at 16. Mr. McCue was clear in pointing out that the development area was very compact, the disturbance amounting to only 2455 square feet: "There's a lot of land area to the north and south. . . . In the grand scheme of things, it really is a small area." Id. at 15, 17. Finally, Mr. McCue testified that to his knowledge, the project was in harmony with the zoning ordinance and the comprehensive plan. Id. at 18.
Appellants' last expert, Mr. Daglieri, a licensed real estate appraiser and broker, testified that without being granted the special use permit and dimensional variance, Appellants would have no ability to enjoy a legally permitted beneficial use of the property; as such, the hardship would constitute more than a mere inconvenience. Id. at 20. Mr. Daglieri also testified that the hardship was due to the unique characteristics of the land and not to any action of the Appellants, id.; that the project would not be detrimental to the public health, safety, general morals and welfare, id.; and that the project would be similar to what has been built in the surrounding area and would be in harmony with the zoning ordinance and the comprehensive plan.Id. at 20-21. *Page 6 
 B THE BOARD'S DECISION
At the conclusion of testimony, the Board denied Appellants' petition by a vote of three to two. At that time, the Board orally made the following findings of fact: (1) "the planning department seems to disagree with the legal opinion that the comprehensive plan allows for this amount of disturbance of something that's essentially ninety-nine percent wetlands;" (2) "Coastal [CRMC] is not happy with proposals made for the property;" (3) "staff recommends against it;" and (4) "the planning board recommends against it." Id. at 29-30. Additionally, the Board accepted the Project Summary of October 22, 2008, which included the Planning Board findings of fact as well as the Staff and Planning Board recommendations. Id. at 30-32.
On December 15, 2008, the Zoning Board of Review issued a formal written decision, denying Appellants' request for a dimensional variance and special use permit. The Board's Decision listed sixteen (16) findings of fact. Significant amongst these was that 98.3 percent of the lot was wetland (Narragansett Zoning Board of Appeals Decision at 5) and that Zoning Board members had inspected the property and based upon their observations, found the property was "very wet in its entirety and . . . [would] require a substantial amount of fill in order to construct the project."Id. at 13. Specifically, with regards to the habitat on the site, the Board found that that habitat was dominated by wetland vegetation, hydric soils, and evidence of wetland hydrology.Id. at 7. Based on the findings that the project would disturb approximately 2455 square feet of wetland, id. at 6, and that the plan did not provide for restoration or replacement of this wetland, id. at 14, the Board concluded that "the project would effectively disturb and/or eliminate a *Page 7 
significant portion of existing viable wetland complex."Id. The Board also found that these wetlands were critically important ecosystems providing a number of beneficial effects to the community. Id. The Board "specifically rejected" the "testimony of applicant's experts regarding the compliance of the project with the development standards . . . [of] Section 4.3 of the Zoning Ordinance," finding that that testimony was "not credible."Id. at 15. The Board further found that the proposal did not meet any of the setback requirements of Section 4.3, and "unlike other projects that have been approved by [the] Board that have been outside of the biological edge of a wetland complex, the project proposed by the applicant in this case propose[d] alternations and a dwelling construct[ed] entirely within the biological wetland."Id. at 16.
Additionally, the Board's Decision cited Staff's finding that the project was "contradictory to several specific policies articulated within the `Goals Policies' and `Land Use Buildout' chapters of the Comprehensive Plan." Id. at 10. Those provisions are
 "(a) Chapter 5 — `Goals Policies':
 `Promote residential land use patterns that reflect and respect the Town's natural resources, wildlife habitat, and rural traditions, reinforce community identity, and provide generous amounts of open space and recreational facilities within the Town's greenbelts.'
 "(b) Chapter 8 — `Land Use Buildout':
 "8.5 Issues: `Managing community impacts from . . . development on pre-existing lots (smaller than is presently required) has the potential to significantly increase the impacts of development in certain areas, especially as sewers are extended to new areas.'
 "8.7 Approach: `While development on pre-existing lots may occur at higher densities than shown on the Future Land Use Plan, pro-active efforts to address or avoid runoff, drainage and sewerage problems in existing densely developed neighborhoods may reduce development densities.' *Page 8 
 "8.8 Strategies: `Continue to protect natural resources from overdevelopment and environmental damage through the use of overlay districts and other regulatory tools.'" Id. at 10.
 II STANDARD OF REVIEW
Superior Court review of zoning board decisions is governed by G.L. 1956 § 45-24-69(d). That section provides:
 "The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 "(1) In violation of constitutional, statutory, or ordinance provisions;
 "(2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error of law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
In reviewing questions of law, this Court conducts de novo
review. Tanner v. Town Council, 880 A.2d 784, 791 (R.I. 2005). In reviewing questions of fact, it is the job of the trial justice to "examine the entire record to determine whether `substantial' evidence exists to support the board's findings." DeStefano v.Zoning Bd. Of Review of Warwick,122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979) (superseded by statute, G.L. 1956 § 45-24-41 — only as it "relate[s] to the burden of proof required to authorize the granting of a dimensional variance" — in Sciacca v. Caruso,769 A.2d 578, 583 (R.I. 2001)). This *Page 9 
Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute [its] findings of fact for those made at the administrative level." Restivo v.Lynch, 707 A.2d 663, 665 (R.I. 1998) (quoting Lett v.Caromile, 510 A.2d 958, 960 (R.I. 1986)). If this Court "can conscientiously find that the board's decision was supported by substantial evidence on the whole record," it must uphold that decision. Mill Realty Assoc. v. Crowe,841 A.2d 668, 672 (R.I. 2004) (quoting Apostolu v. Genovesi,120 R.I. 501, 509, 388 A.2d 821, 825 (1978)); seeMonroe v. Town of East Greenwich, 733 A.2d 703 (R.I. 1999). "Substantial evidence is relevant evidence that a reasonable person would accept as adequate to support the board's conclusion and amounts to `more than a scintilla but less than a preponderance.'"Lischio v. Zoning Bd. Of Review of the Townof North Kingstown, 818 A.2d 685, 690 n. 5 (R.I. 2003) (quotingCaswell v. George Sherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981)). Furthermore, in cases where the board members have traveled to the site, viewed the site, and made personal observations of the conditions at that site, these observations by the board members may "constitut[e] legal evidence capable of sustaining a board's decision . . ." so long as "such conditions and circumstances [are] disclosed in the record."Dawson v. Zoning Board of Review of the Town of Cumberland,97 R.I. 299, 303, 197 A.2d 284, 286 (1964) (citing Zimarino v.Zoning Board of Review of the City of Providence,95 R.I. 383, 187 A.2d 259 (R.I. 1963)). *Page 10 
 III LAW AND ANALYSIS A Alleged Error of Law
Appellants claim that the Board's Decision was affected by error of law. Specifically, they maintain that the Board erroneously concluded that under § 12.5[9] of the Ordinance, if the development standards of § 4.3(4)[10] were not met, the application for a special use permit must be denied. Appellants argue that this construction would defeat the purpose of the Ordinance because it is precisely these situations — situations wherein the development standards of § 4.3(4) cannot be met — in which the Ordinance anticipates a special use permit will be required. (Appellants' Br. at 16.)
Zoning ordinances are interpreted in the same manner as are statutes. See Mongony v. Bevilacqua,432 A.2d 661, 663 (R.I. 1981). Interpretation of zoning ordinances is a question of law to be reviewed by the Superior Court denovo. See Cohen v. Duncan,970 A.2d 550, 562 (R.I. 2000). Because this Court reviews issues of statutory construction de novo, it is not bound by the zoning board's determination of the law. Id. Nonetheless, because "a zoning board of review is presumed to have knowledge concerning those matters which are related to an effective administration of the zoning ordinance," Monforte v. Zoning Board of Review of Cityof East Providence, 93 R.I. 447, 449, 176 A.2d 726, 728 (1962), the Court gives "weight and deference to a zoning board's interpretation and application of the zoning ordinance, provided its construction is not clearly erroneous or unauthorized."Cohen, 970 A.2d at 562 (citing Pawtucket *Page 11 Transfer Operations, LLC v. City of Pawtucket,944 A.2d 855, 859-60 (R.I. 2008)). This deference, however, does not amount to "blind allegiance," nor does this Court "mindlessly `rubberstamp' the agency." Citizens Savings Bank v. Bell,605 F. Supp. 1033, 1042 (D.R.I. 1985). In accordance with the rules of statutory construction, this Court will review the statute and give clear and unambiguous language its plain and ordinary meaning. Pawtucket Transfer Operations, LLC,944 A.2d at 859. In those instances "when the language of a statute or a zoning ordinance is clear and certain, there is nothing left for interpretation and the ordinance must be interpreted literally."Cohen, 970 A.2d at 562 (quoting Mongony,432 A.2d at 663).
Section 12.5 of the Ordinance states, "The zoning board of review may not grant a special use permit unless it finds the following []. . . ." Ordinance § 12.5. This language clearly mandates that the Board must find all of the subsequently enumerated requirements fulfilled in order to grant a special use permit. The first of these requirements is "[t]hat the use will comply with all
applicable requirements and development and performance standards set forth in sections 4 and 7 of this ordinance; except
that the board may grant a variance from dimensionalsetbacks incorporated in the development standards of section 4.3(4) of the coastal and freshwater wetlands overlay district. . . ." Ordinance § 12.5(1) (emphasis added). In interpreting exceptions contained within statutes or ordinances, it is understood that when the statute or ordinance contains "an express exception, it comprises the only limitation on the operation of the statute and no other exceptions will be implied." 2A Norman J. Singer and J.D. Shambie Singer, Sutherland Statutes andStatutory Construction, § 47:11 (7th ed. 2010). Such is the case here: the Ordinance exempts only the dimensional setback requirements from mandatory *Page 12 
compliance. Therefore, the dimensional setback requirements are the only exception; all other standards contained within §§ 4 and 7 must be fulfilled in order for the Board to grant a special use permit. See id.; Ordinance § 12.5(1).
Section 4.3(4) lists nine development standards, lettered (a) through (i), with which the proposed development must comply. Of these nine standards only two, subsections (a) and (b), contain dimensional setback requirements. And of those two, only subsection (a) is applicable to the Appellants' property. It states, "For lots platted prior to August 7, 1989, in areas serviced by both sewers and water, structures, roads and land disturbance shall be set back one hundred feet from the wetland edge[.]" Ordinance § 4.3(4)(a).
In reading §§ 4.3(4) and 12.5 in concert, a clear statutory framework is set out. Under § 12.5, the Board is permitted to grant dimensional variances from the requirements of § 4.3(4)(a) and (b); however, the Board is not permitted to grant a special use permit unless all of the other requirements of § 4.3(4) and § 12.5 are met. Those additional requirements are listed below:
 Section 4.3(4) Requirements "c. The proposed project will not obstruct floodways in any detrimental way, or reduce the net capacity of the site to retain floodwaters;
 "d. The proposed project will not cause any sedimentation of wetlands, and will include all necessary and appropriate erosion and sediment control measures; "e. The proposed project will not reduce the capacity of any wetlands to absorb pollutants;
 "f. The proposed project will not degrade the biological, ecological, recreational, educational, and research values of any wetlands;
 "g. The proposed project will not directly or indirectly degrade water quality in any wetlands or waterbody; "h. The proposed project will not reduce the capacity of any wetlands to recharge groundwater; *Page 13 
 "i. The proposed project will not degrade the value of any wetlands as spawning grounds and nurseries for fish and shellfish or habitat for wildlife and wildfowl." Ordinance § 4.3(4).
 Section 12.5 Requirements "[T]he use will be in harmony with the general purpose and intent of this ordinance and the comprehensive plan of the town of Narragansett[.]" Ordinance § 12.5(2).
Because the Board's Decision rested upon findings of fact that establish that several of these mandatory requirements were not fulfilled, that Decision was neither in violation of ordinance provisions, nor affected by error of law.
 B Excess of Authority
Appellants additionally argue that the Board's Decision was based on findings that Appellants' proposal would not comply with the standards imposed by CRMC, and that in basing its Decision on these findings, the Board added its own requirements to those imposed by § 12.5 of the Ordinance in excess of its statutory authority. Appellants rely on Mercurio v. The Zoning Board of Review of theTown of Narragansett, 2007 WL 4471143 (R.I. Super. 2007) for support.
In Mercurio, the Zoning Board was called upon to "consider the effect that the proposed use has on the surroundingproperties as well as on the public health and safety."Id. at 7 (emphasis in original). In making this determination, the Board in Mercurio found that "`according to the CRMC, a minimum fifty foot setback from a coastal feature `is considered to be of particular concern in a high hazard flood zone.'"Id. The court found that "these findings do not speak to any potential hazard posed to the surrounding properties or to the public health and safety. Rather, they are relevant only to . . . a consideration [that was] not before the Board." Id. The court, therefore, ruled *Page 14 
that "[t]o the extent that the Board's denial of Appellants' application turned on . . . the absence of a fifty foot setback from the coastal feature, . . . the Board exceeded its statutory authority as it essentially added its own requirements to those found in Ordinance § 12.5." Id. at 7.
The instant case is distinguishable from Mercurio. Here, the consideration before the Board was whether the proposed use would negatively affect the wetlands. The Board found that "CRMC[] completed a Preliminary Determination [which] stated that the lot appears to be composed almost entirely of wetlands and that it would appear difficult to satisfactorily avoid and minimize impacts to these wetlands." (Narragansett Zoning Board of Appeals Decision at 8.) The issue for which the CRMC preliminary determination was cited was directly relevant to a consideration that was appropriately before the Board. Moreover, consideration of the "values and dynamic nature of . . . freshwater . . . wetlands" in "providing for orderly . . . development" is expressly listed as one of the "general purposes of zoning ordinances" under our General Laws. G.L 1956 § 45-24-30(3)(iii). In considering CRMC's report on the proposal's impact to the wetland, the Board did not add any additional requirements to those already found in the Ordinance pursuant to the enabling act. The Board did not, therefore, act in excess of its statutory authority.
 C Findings of Fact and Substantial Evidence
Rhode Island courts have long required that decisions by zoning boards include findings of fact, Zammarelli v. Beattie,459 A.2d 951, 953 (R.I. 1983), and that those findings be supported by substantial evidence on the record. DeStefano,122 R.I. at 245, *Page 15 405 A.2d at 1170 (superseded by statute, G.L. 1956 § 45-24-21 — only as it "relate[s] to the burden of proof required to authorize the granting of a dimensional variance" — in Sciacca, 769 A.2d at 583). Appellants contend that the Board did not make findings of fact sufficient to support the denial of the requested dimensional variance and special use permit, and to the extent that the Board did make such findings, there is no competent legal evidence in the record to support those findings. Appellants submit that the record evidence, specifically the uncontradicted expert testimony, establishes the project's compliance with the requirements for granting a special use permit and dimensional variance.
In its decision, the Board made sixteen findings of fact. Amongst these are that the project "would effectively disturb and/or eliminate a significant portion of the existing viable wetland," (Narragansett Zoning Board of Appeals Decision at 10), that the plan does not restore or replace the wetland that is to be disturbed, (Narragansett Zoning Board of Appeals Decision, Grounds at 4), and that the Board does not believe that such an elimination of viable wetland is in conformance with the Comprehensive Plan or the development standards of § 4.3, despite expert testimony to the contrary. (Narragansett Zoning Board of Appeals Decision at 10, 15.) These findings are sufficient to support both the denial of a special use permit under §§ 12.5(1) and (2), and a dimensional variance under § 11.6.[11] See
Ordinance §§ 12.4 and 12.5; see Zammarelli, *Page 16 459 A.2d at 953. Therefore, this Court must now determine whether the record contains substantial evidence to support these findings.
 1 Board Observations and Expert Testimony
During the hearing, Appellants' three experts testified that Appellants' proposal was in compliance with the comprehensive plan and the Ordinance. In its Decision, the Board found the experts' testimony was not credible and thereby specifically rejected it. (Narragansett Zoning Board of Appeals Decision at 14.) Appellants contend that the Board erred in disregarding this uncontradicted expert testimony.
Our Supreme Court has recognized that "there is no talismanic significance to expert testimony. It may be accepted or rejected by the trier of fact. . . ." Restivo, 707 A.2d at 671. InRestivo, our Supreme Court upheld a decision of the East Providence city council denying a request for subdivision approval. The petitioner in Restivo claimed that the city council improperly disregarded uncontradicted expert testimony in favor of personal observations by council members. Our Supreme Court disagreed with petitioner's argument, citing its decision in Perron v. Zoning Board of Review ofBurrillville, 117 R.I. 571, 576, 369 A.2d 638, 641 (1977), in which it held "that evidence gleaned from the personal observations of zoning board members constituted `legally competent evidence upon which a finding may rest . . . if the record discloses the nature and character of the observations upon which the board acted."'Restivo, 707 A.2d at 668 (quoting Perron,117 R.I at 576, 369 A.2d at 641). Because the council members inRestivo had visited the site in order to observe the drainage conditions, and then *Page 17 
disclosed those observations on the record, these observations constituted sufficient evidence to sustain the council's decision.[12]
In the instant case, at least one member of the Board, Board Member O'Neill, had been to the site and observed that the property was "very, very wet." (Tr. Narragansett Zoning Board of Review Hr'g, Nov. 20, 2008 at 12.) Board Member Goodrich, whether from personal observations of the site or the site plan, observed that the plan called for "a lot of fill." Id. These observations, which the Board Members disclosed on the record during the hearing, were subsequently included in the Board's Decision as finding of fact 13. (Narragansett Zoning Board of Appeals Decision at 13 ("[T]he Zoning Board members are familiar with the property, having inspected it prior to the application, and based upon these observations, the Board finds that the property is very wet in its entirety and that it will require a substantial amount of fill in order to construct the project as proposed.")). At the hearing, Appellants' expert confirmed both of these observations during cross-examination — admitting that "a lot of fill" would need to be deposited "in the wetland." (Tr. Narragansett Zoning Board of Review Hr'g, Nov. 20, 2008 at 12.)
These observations, disclosed on the record and included in the Board's written Decision, are sufficient legal evidence with which the Board was permitted to question the credibility of Appellants' experts. These experts, despite admitting that the proposal would effectively eliminate one-third of the viable freshwater wetland on the property, testified that the elimination of this wetland would not negatively affect the wetland. See id. As the adjudicative body, a zoning board's position is analogous to that of other *Page 18 
administrative agencies, which sit at "the mouth of the funnel" and evaluate the adjudicative process. Environmental ScientificCorporation v. Durfee, 621 A.2d 200, 208 (R.I. 1993). Review in this Court is an extension of that administrative process, and this Court, being further removed from the adjudicative process, must give deference to the factfinder. Id.
In reviewing zoning board decisions, this Court does not pass upon the credibility of witnesses. Restivo, 707 A.2d at 665. It reviews the record for substantial evidence to support the Board's findings. DeStefano,122 R.I. at 245, 405 A.2d at 1170 (superseded by statute, G.L. 1956 § 45-24-21 — only as it "relate[s] to the burden of proof required to authorize the granting of a dimensional variance" — in Sciacca, 769 A.2d at 583). Here, because the Board members personally observed the site and disclosed their observations, there exists legally competent evidence on the whole record to support the Board's rejection of Appellants' experts' testimony. Therefore, the Board's decision to reject the experts' opinions in favor of contrary evidence gleaned from personal knowledge and observation was not affected by error of law.See Perron, 117 R.I at 576, 369 A.2d 641-642.
 2 Developmental Standards of § 4.3(4)
Much of the expert testimony that the Board rejected concerned the project's compliance with the developmental standards of § 4.3 of the Narragansett Zoning Ordinance. The Board found that "[t]he proposal does not meet any of the setback requirements set forth in Section 4.3 and, unlike other projects that have been approved by this Board that have been outside of the biological edge of a wetland complex, the *Page 19 
project proposed by the applicant in this case proposes alterations and a dwelling construction entirely within the biological wetland." (Narragansett Zoning Board of Appeals Decision at 16.) While the dimensional setback requirements of § 4.3(4) are not mandatory, [13] the other requirements of § 4.3(4) are. Section 4.3(4)(d) requires that "[t]he proposed project will not cause any sedimentation of wetlands, and will include all necessary and appropriate erosion and sediment control measures." Ordinance § 4.3(4)(d) (emphasis added). During the hearing, Appellants' expert, Mr. Carrigan, was asked, "Have you addressed any sedimentations of the wetlands and erosions?" (Tr. Narragansett Zoning Board of Review Hr'g, Nov. 20, 2008 at 8.) He responded, "Yes. We are proposing to install a silt fence and/or straw bale barriers around the perimeter of the limits ofdisturbance." Id. (emphasis added). Mr. Carrigan's statement does not establish that sedimentation would not occurwithin the limits of disturbance. In fact, upon cross examination, Mr. Carrigan confirmed that the project would require a substantial amount of fill to be deposited "in the wetland."Id. at 12 (emphasis added). The Board found this testimony did not credibly establish that the project was in compliance with the requirements of § 4.3. (Narragansett Zoning Board of Appeals Decision at 15.) Because there is substantial evidence on the record to support this finding, it must be upheld.
Section 4.3(4) also requires that, "e. The proposed project will not reduce the capacity of any wetlands to absorb pollutants,"id. (emphasis added), and "h. The proposed project will not reduce the capacity of any wetlands to recharge groundwater."Id. (emphasis added). Appellants' experts simultaneously affirm that that the project will eliminate one-third of the viable biological wetland on the property, while maintaining *Page 20 
that the project would not reduce the capacity of anywetlands to absorb pollutants or recharge groundwater. (Tr. Narragansett Zoning Board of Review Hr'g, Nov. 20, 2008 at 8-9, 15-17.) The Board found that the project would eliminate a portion of viable biological wetland that would not be replaced. (Narragansett Zoning Board of Appeals Decision, Grounds at 4.) In concert with that finding, the Board found that the above-referenced testimony did not credibly establish that the project was in compliance with the requirements § 4.3. (Narragansett Zoning Board of Appeals Decision at 15.) Because there is substantial evidence on the record to support this finding, it must be upheld.
There exists substantial evidence to support the Board's findings that the project was not in compliance with the requirements of § 4.3(4). Accordingly, the Board's Decision to deny Appellants' request for a special use permit and dimensional variance must be upheld.[14]
 3 The Comprehensive Plan
Under § 12.5(2), "The zoning board of review may not grant a special use permit unless it finds . . . [t]hat the use will be in harmony with the general purpose and intent of this ordinance and the comprehensive plan of the town of Narragansett[.]" Ordinance § 12.5(2). In its Decision, the Board cited findings that the project "would be contradictory to several specific policies articulated within the `Goals Policies' and `Land Use Buildout' chapters of the Comprehensive Plan." (Narragansett Zoning Board of Appeals Decision at 10.) Those portions of the Comprehensive Plan are *Page 21 
 "(a) Chapter 5 — `Goals Policies':
 `Promote residential land use patterns that reflect and respect the Town's natural resources, wildlife habitat, and rural traditions, reinforce community identity, and provide generous amounts of open space and recreational facilities within the Town's greenbelts.'
 "(b) Chapter 8 — `Land Use Buildout':
 "8.5 Issues: `Managing community impacts from . . . development on pre-existing lots (smaller than is presently required) has the potential to significantly increase the impacts of development in certain areas, especially as sewers are extended to new areas.'
 "8.7 Approach: `While development on pre-existing lots may occur at higher densities than shown on the Future Land Use Plan, pro-active efforts to address or avoid runoff, drainage and sewerage problems in existing densely developed neighborhoods may reduce development densities.'
 "8.8 Strategies: `Continue to protect natural resources from overdevelopment and environmental damage through the use of overlay districts and other regulatory tools.'"
 Id.
The Comprehensive Plan specifically lists the use of overlay districts as one of the strategies to be used in protecting the natural resources of the Town of Narragansett from overdevelopment and environmental damage. See id. Section 4.3 of the Narragansett Zoning Ordinance creates such an overlay district, the "Coastal and Freshwater Wetlands Overlay District." Section 4.3 states, "It is the policy of the State of Rhode Island and the Town of Narragansett to preserve and protect coastal and freshwater wetlands in the interests of the public health, safety, and general welfare of the community." Ordinance § 4.3.
During the hearing below, the Board found, and the record supports, that Appellants' plan calls for the effective elimination of 2455 square feet of wetland, wetland for which "no mitigation or restoration or replacement plan has been submitted." (Narragansett *Page 22 
Zoning Board of Appeals Decision at 6, Grounds at 4.) In its Decision, the Board determined that the elimination of this wetland would be contrary to the goals and policies cited above, goals and policies that seek to protect the natural resources of Narragansett from environmental damage. (Narragansett Zoning Board of Appeals Decision at 10.) Our Supreme Court has recognized the importance of comprehensive plans in our land use system. See Town of East Greenwich v. NarragansettElectric Co., 651 A.2d 725, 727 (R.I. 1994) (rejecting the argument that a comprehensive plan is simply an "innocuous general-policy statement" of "long-range . . . planning goals," and holding that a compressive plan "establishes a binding framework or blueprint that dictates town and city promulgation of conforming zoning and planning ordinances[]"). Therefore, the interpretation of the Comprehensive Plan by the Board is not clearly erroneous or in excess of its statutory authority.
 IV Conclusion
For the reasons set forth above, this Court finds that the Board's Decision, denying Appellants' application for a special use permit and dimensional variance, was not affected by error of law or unsupported by the substantial evidence of the whole record or in excess of the Board's statutory authority. Substantial rights of the Appellants have not been prejudiced. Therefore, the Decision of the Board is affirmed. Counsel should submit the appropriate judgment for entry.
[1] The property is approximately 8400 square feet in a R-20 zone requiring 20,000 square foot lots.
[2] These standards are excerpted in relevant portion later in this Decision.
[3] Not all development proposals require special use permits. Sections 4.3(3)(a)-(h) list the type of development for which a special use permit is required. While §§ 4.3(3)(a)-(h) do not encompass every conceivable type of development, they are very broad in nature and encompass most development projects, including that proposed by Appellants.
[4] Section 4.3(3) informs applicants that mere compliance with the provisions of the Narragansett Zoning Ordinance does not guarantee final development approval for a proposal. The applicants must additionally go to the State Coastal Resources Management Council (CRMC) and Department of Environmental Management (DEM) and demonstrate the proposal's compliance with the provisions set forth by those agencies.
[5] While some references are made to § 6.4, it is § 6.5, not § 6.4, that is the applicable section for Appellants' property.
[6] Appellants propose a ten foot setback, whereas, section 6.5 requires a twenty-five foot setback.
[7] Under Narragansett Zoning Ordinance § 12.4, "[t]he zoning board of review may grant a dimensional variance . . . in conjunction with a special use permit," for "[a]ny use or structure proposed for construction in an overlay district[,]" "provided that the relief does not have the effect of allowing a structure to be placed closer to a wetland or coastal feature."
[8] Mr. Carrigan submitted a hydrology report to support his findings that runoff to adjacent properties would not be an issue, as stormwater rates and volumes would be retained on site. (Narragansett Zoning Board of Review Hr'g., Nov. 20, 2008, Ex. 4.)
[9] Ordinance § 12.5 sets out the governing standards for granting a special use permit.
[10] Ordinance § 4.3(4) sets out the development standards for construction within a Coastal and Freshwater Wetlands Overlay District.
[11] Appellants' brief asserts that the Board's Decision was faulty in that it failed to state that the Applicants' dimensional variance was denied. However, Appellants later recognize that under Narragansett Zoning Ordinance § 12.4, "[i]f the special use could not exist without the dimensional variance," which Appellants concede it cannot, then "the zoning board of review shall consider the special use permit and the dimensional variance together to determine if granting the special use is appropriate based on both the special use criteria and the dimensional variance evidentiary standards." (Appellants Br. at 11.) For this reason, the Board's Decision did not need to separately deny Appellants' request for a dimensional variance if it determined that the special use permit could not be granted.
[12] In its Decision in Restivo, our Supreme Court noted that in cases where lay observations concern arcane subject matter, those observations may not be sufficient to sustain a board's decision. Restivo, 707 A.2d 671 (citing Salve ReginaCollege v. Zoning Board of Review of Newport,594 A.2d 878, 881-882 (R.I. 1991) (Lay testimony regarding traffic data was not competent and had no probative force.)).
[13] See Ordinance § 12.5(1), discussedsupra.
[14] See n. 11, supra. *Page 1